No. 23-60626

# In the United States Court of Appeals for the Fifth Circuit

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS;
MANAGED FUNDS ASSOCIATION;
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

On Petition for Review of Orders of the
Securities and Exchange Commission

## OPENING BRIEF FOR PETITIONERS

JEFFREY B. WALL
JUDSON O. LITTLETON
MADELINE B. JENKS
COOPER F. GODFREY
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners*

March 5, 2024

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are parents of any petitioner or that own stock in the petitioners.

## A.    Petitioners

National Association of Private Fund Managers

Managed Funds Association

Alternative Investment Management Association

Others who are not participants in this matter but may be financially interested in its outcome include members of the National Association of Private Fund Managers, Managed Funds Association, and Alternative Investment Management Association.

**B.    Attorneys for Petitioners**

Jeffrey B. Wall
Judson O. Littleton
Madeline B. Jenks
Cooper F. Godfrey
Sᴜʟʟɪᴠᴀɴ & Cʀᴏᴍᴡᴇʟʟ LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC  20006

**C.    Respondent**

Securities and Exchange Commission

**D.    Attorneys for Respondent**

Megan Barbero
Dominick V. Freda
Emily True Parise
Stephen Aaron Silverman
Sᴇᴄᴜʀɪᴛɪᴇs ᴀɴᴅ Exᴄʜᴀɴɢᴇ Cᴏᴍᴍɪssɪᴏɴ
100 F Street, N.E.
Washington, DC  20549

Dated:  March 5, 2024

*/s/ Jeffrey B. Wall*
Jᴇꜰꜰʀᴇʏ B. Wᴀʟʟ

*Counsel for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners challenge two rules promulgated by the Securities and Exchange Commission that impose fundamentally inconsistent public disclosure requirements.  Although the rules are indisputably interconnected and were finalized on the same day, the Commission did not attempt to consider whether or how the two rules interact—even after requesting comments on that very issue.  Instead, the Commission adopted directly contradictory approaches without any acknowledgment or explanation, and never evaluated the cumulative economic effect of the two rules either on affected parties or on price efficiency, market liquidity, competition, and capital formation.  The case thus requires this Court to address important questions about agencies' obligations to adopt consistent regulatory approaches (or at least reasonably explain apparently inconsistent ones) and to consider the cumulative economic effects of interrelated rules in the course of rulemaking.  Petitioners respectfully submit that oral argument could materially assist the Court in considering these important issues.

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTERESTED PERSONS................................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................... iii

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT ....................................................6

STATEMENT OF THE ISSUES ......................................................7

STATEMENT OF THE CASE .........................................................8

    A.    Short Sales And Securities Loans................................8

    B.    The Proposed Rules.................................................12

        1.    The Proposed Securities Lending Rule ...............12

        2.    The Proposed Short Sale Rule And The Reopening Of The Securities Lending Comment Period ......................14

    C.    The Final Rules ......................................................18

        1.    The Final Securities Lending Rule ......................18

        2.    The Final Short Sale Rule ....................................22

STANDARD OF REVIEW ...............................................................26

SUMMARY OF ARGUMENT............................................................26

ARGUMENT ...................................................................................29

I.    THE SECURITIES LENDING RULE AND THE SHORT SALE RULE ARE BOTH INVALID WHEN CONSIDERED TOGETHER ...............................................................................29

    A.    The Commission's Refusal To Consider Or Justify Its Contradictory Approaches To Disclosure Of The Same Market Activity Was Arbitrary And Capricious ..........................30

B.    The Commission's Refusal To Assess The Cumulative Economic Impact Of The Two Interrelated Rules Violated The Exchange Act And The APA ...................................................39

II.    THE SECURITIES LENDING RULE IS INVALID IN ITS OWN RIGHT ..............................................................................46

A.    The Securities Lending Rule Is Contrary To Law And Inexplicably Departs From The Commission's Prior Position ................................................................................46

B.    The Commission Deprived The Public Of A Meaningful Opportunity For Comment ..............................................50

III.    THE SHORT SALE RULE IS INVALID IN ITS OWN RIGHT ......53

A.    The Commission Did Not Reasonably Explain Why It Refused To Adopt A Less Burdensome Alternative ...................54

B.    The Short Sale Rule Cannot Apply Extraterritorially To Short Sales Of Foreign Securities Traded On Foreign Exchanges ........................................................................58

CONCLUSION................................................................................64

# TABLE OF AUTHORITIES

*Page(s)*

<span style="font-variant: small-caps;">CASES</span>

*All. for Hippocratic Med.* v. *FDA,*
    78 F.4th 210 (5th Cir. 2023) ...................................................26

*Bus. Roundtable* v. *SEC,*
    647 F.3d 1144 (D.C. Cir. 2011)..........................................39, 44

*Chamber of Com. of U.S.* v. *Dep't of Lab.,*
    885 F.3d 360 (5th Cir. 2018).................................................38

*Chamber of Com. of U.S.* v. *SEC,*
    412 F.3d 133 (D.C. Cir. 2005)............................................39, 44

*Chamber of Com. of U.S.* v. *SEC,*
    85 F.4th 760 (5th Cir. 2023) .........................................26, 29, 32, 39

*El Paso Elec. Co.* v. *FERC,*
    76 F.4th 352 (5th Cir. 2023) ................................................26

*FCC* v. *Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)........................................................49, 50

*Jones* v. *Hendrix,*
    599 U.S. 465 (2023)...........................................................48

*MCorp Fin., Inc.* v. *Bd. of Governors Fed. Rsrv. Sys. of U.S.,*
    900 F.2d 852 (5th Cir. 1990)................................................48

*Merck & Co.* v. *Dep't of Health & Hum. Servs.,*
    962 F.3d 531 (D.C. Cir. 2020)............................................63, 64

*Mexican Gulf Fishing Co.* v. *U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ................................................32

*Michigan* v. *EPA,*
    213 F.3d 663 (D.C. Cir. 2000)...............................................53

*Mock* v. *Garland*,
 75 F.4th 563 (5th Cir. 2023) ...............................................50, 51

*Morrison* v. *Nat'l Australia Bank Ltd.*,
 561 U.S. 247 (2010).......................................58, 59, 60, 62

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto Ins. Co.*,
 463 U.S. 29 (1983).......................................29, 30, 54

*Perez* v. *Mortg. Bankers Ass'n*,
 575 U.S. 92 (2015).......................................................32

*Prometheus Radio Project* v. *FCC*,
 652 F.3d 431 (3d Cir. 2011) ...............................................50, 52

*R.J. Reynolds Vapor Co.* v. *FDA*,
 65 F.4th 182 (5th Cir. 2023) ...............................................7

*RJR Nabisco, Inc.* v. *Eur. Cmty.*,
 579 U.S. 325 (2016).......................................60, 61, 62

*Sierra Club* v. *EPA*,
 939 F.3d 649 (5th Cir. 2019).......................................................32

*Sw. Elec. Power Co.* v. *EPA*,
 920 F.3d 999 (5th Cir. 2019).......................................30, 32, 38

*Tex. Ent. Ass'n* v. *Hegar*,
 10 F.4th 495 (5th Cir. 2021) ...............................................6, 7

*Texas* v. *EPA*,
 91 F.4th 280 (5th Cir. 2024) ...............................................38

*United Steelworkers of America, AFL-CIO-CLC* v. *Schuylkill Metals Corp.*,
 828 F.2d 314 (5th Cir. 1987).......................................................52

*Wages & White Lion Invs., L.L.C.* v. *FDA*,
 16 F.4th 1130 (5th Cir. 2021) ...............................................26

STATUTES AND REGULATIONS

5 U.S.C. § 553 .................................................................50

5 U.S.C. § 706 .................................................................26

15 U.S.C. § 78c ...........................................................26, 39

15 U.S.C. § 78f ................................................................6

15 U.S.C. § 78k-1 .............................................................6

15 U.S.C. § 78*l* ...........................................................61, 62

15 U.S.C. § 78m .......................................................47, 61, 63

15 U.S.C. § 78o-3 .............................................................6

15 U.S.C. § 78q ................................................................6

15 U.S.C. § 78y .............................................................6, 7

Pub. L. 111-203, sec. 984(b) (codified at 15 U.S.C. § 78j note).........47

H.R. 4173 § 7422 (Dec. 11, 2009) .....................................47

17 C.F.R. § 242.200 ...........................................................8

*Form CRS Relationship Summary; Amendments to Form ADV*,
   84 Fed. Reg. 33,492 (July 12, 2019)..............................42

*Investment Company Liquidity Risk Management Programs*,
   81 Fed. Reg. 82,142 (Nov. 18, 2016)..............................43

*Investment Company Reporting Modernization*,
   81 Fed. Reg. 81,870 (Nov. 18, 2016)...........................41, 43

*Investment Company Swing Pricing*,
   81 Fed. Reg. 82,2084 (Nov. 18, 2016)...........................43

*Regulation Best Interest: The Broker-Dealer Standards*,
   84 Fed. Reg. 33,318 (July 12, 2019)...........................41, 42

OTHER AUTHORITIES

FINRA Regulatory Notice 21-19, *FINRA Requests Comment on Short Interest Position Reporting Enhancements and Other Changes Related to Short Sale Reporting* (June 4, 2021)......................16, 57

*Guidance Regarding the Commission's Emergency Order Concerning Disclosure of Short Selling* (Sept. 24, 2008)...........................63

Hester M. Peirce, *Dissenting Statement on Reporting of Securities Loans* (Oct. 13, 2023) ...............................................................21, 22

Hester M. Peirce, *Dissenting Statement on Short Sale Disclosure* (Oct. 13, 2023) ..................................................24, 25, 54, 55, 56, 57

*Key Points About Regulation SHO*, SEC (May 31, 2022)..................................9

Mark T. Uyeda, *Dissenting Statement on Reporting of Securities Loans* (Oct. 13, 2023) .........................................................21, 50, 51

Mark T. Uyeda, *Dissenting Statement on Short Position and Short Activity Reporting by Institutional Investment Managers* (Oct. 13, 2023) ........................................................25, 57

*SEC Open Meeting Agenda* (Oct. 13, 2016) ........................................................42

*SEC Open Meeting Agenda* (June 5, 2019)..................................................41, 42

*SEC Open Meeting Agenda* (Oct. 13, 2023) ........................................................18

*Short Sale Position and Transaction Reporting*, SEC Division of Economic and Risk Analysis (June 5, 2014) ...........................................11, 49

*The Inspector General's Statement on the SEC's Management and Performance Challenges* (Oct. 2022) ...........................................................4

**INTRODUCTION**

This case is about whether the Administrative Procedure Act permits federal agencies to adopt highly interconnected rules—that the agency admits relate to the same activity—without considering whether they are consistent. Here, the Securities and Exchange Commission finalized two rules on the *same* day that require public disclosure of the *same* market activity, but adopted fundamentally inconsistent approaches to such disclosure without acknowledging (much less explaining) the contradictions—or even inquiring whether there were any. The Commission's conduct is about as arbitrary and capricious as agency action gets.

The two rules that petitioners challenge require extensive new public disclosures related to "short-sale" transactions, which are sales of a stock that an investor does not own. Investors carry out such transactions by arranging to borrow the stock they intend to sell, while taking on the obligation to later purchase that same stock and return it to the lender. As the Commission, academics, and market participants widely recognize, such transactions provide important benefits to markets, including by promoting price efficiency and market liquidity.

One rule, the Short Sale Rule, addresses public disclosure of short-sale information itself; the other, the Securities Lending Rule, addresses public disclosure of the securities loans used to facilitate short sales. As the Commission itself has repeatedly acknowledged, there is an integral relationship between the two—a typical short sale is linked to the corresponding securities loan the investor used to facilitate the sale. Securities loans thus serve as direct proxies for short sales, and disclosing the former will inherently reveal the latter. They are two sides of the same coin. Given that connection, the Commission sensibly solicited comments on the interactions between the two rules. But the Commission then ignored those comments and inexplicably did not consider whether the two rules are consistent.

Judging by the rules themselves, the Commission did so because it had nothing to say: the rules adopt wildly inconsistent disclosure regimes with respect to the same market activity. In the Short Sale Rule, the Commission concluded that publicly disclosing short sales can substantially harm markets and investors by revealing short sellers' investment strategies, and by increasing the threat of retaliation against short sellers by other market

participants. It therefore determined that short-sale information should be published only on an *aggregated* and *delayed* basis.

In the Securities Lending Rule, however, the Commission took the exact opposite approach, requiring the publication of granular detail reflecting short-sale activity on a *transaction-by-transaction*, *next-day* basis. Not only did the Commission fail to justify that contradictory approach; it did not even acknowledge the issue. That glaring failure to adopt a coherent approach to these two highly interrelated rules flies in the face of the APA's reasoned decisionmaking requirement, and requires this Court to set both rules aside so that the Commission can develop a unified, sensible approach.

The Commission's economic analysis in each rule was just as deficient, because the Commission never assessed both rules in combination. Incredibly, the Commission stated that it would ignore the Short Sale Rule's requirements in its economic analysis of the Securities Lending Rule because the former "remained at the proposal stage"—even though it was scheduled to be finalized *minutes later* at the same open meeting. And the Short Sale Rule considered only the effects of any overlap in "compliance periods" between the two rules—not any *substantive* overlap. As a result, the Commission never attempted to analyze the cumulative economic impact—based on a consistent

assessment of the combined costs and benefits—of these two highly interrelated rules that require disclosure of the same market activity.

Whether that failure was by mistake, design, or a sheer inability to keep up with the unprecedented pace of rulemaking at the Commission, *see The Inspector General's Statement on the SEC's Management and Performance Challenges* (Oct. 2022), https://www.sec.gov/oig/inspector-generals-statement-secs-management-and-performance-challenges-october-2022, the Commission's blinkered approach makes a mockery of the Commission's obligation under the Securities Exchange Act and the APA to conduct a rigorous economic analysis, and provides another reason to vacate the two rules.

The rules are unlawful not only in tandem, but also on their own. As to the Securities Lending Rule, the Commission's decision to require next-day publication of granular information about individual securities loans—again, proxies for short sales—directly conflicts with Congress's directive in the Dodd-Frank Act to only publish short-sale information on a periodic, aggregate basis. And it also departs from the Commission's own prior findings in a report prepared pursuant to the Dodd-Frank Act without any explanation. Furthermore, the Commission violated the APA's procedural requirements

when it made significant changes in the final rule—including changes it wrongly believed would address concerns about overly granular short-sale disclosure—without giving the public a meaningful opportunity to comment on whether those changes would actually solve the problem.

As to the Short Sale Rule, the Commission failed to explain why it imposed the substantial costs and increased security risks of a brand-new reporting regime instead of simply expanding an existing regime that already publishes similar information. The Court should likewise reject the Commission's attempt to invent a global short-sale reporting regime by extending this rule's reporting requirements to short sales of foreign securities traded on foreign exchanges. Congress gave the Commission no such authority to apply its rule extraterritorially, and doing so makes no sense in its own right.

In short, both in tandem and on their own, these two rules represent unlawful exercises of rulemaking authority and should be set aside. The stakes extend far beyond this case. Sanctioning the Commission's approach to these two interrelated rules will provide a blueprint for agencies to avoid having to justify or account for inconsistencies between overlapping rules by simply

addressing related issues in separate rulemakings and strategically timing their finalization. The APA requires courts to see through such artifices.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 78y(b)(1), which permits a person aggrieved by a Commission rule promulgated under, among other provisions, 15 U.S.C. §§ 78f, 78k-1, 78o-3, and 78q, to obtain review of that rule in a court of appeals. Petitioners filed their petition for review on December 12, 2023. Dkt. 1-2. The petition is timely because it was filed "within sixty days" of the Commission's "promulgation of the rule" on October 13, 2023. 15 U.S.C. § 78y(b)(1); *see Reporting of Securities Loans*, A.R.4, published at 88 Fed. Reg. 75,644 (Securities Lending Rule or Sec. Lend. R.); *Short Position and Short Activity Reporting by Institutional Investment Managers*, A.R.2044, published at 88 Fed. Reg. 75,100 (Short Sale Rule or Short Sale R.).[1]

Petitioners have standing. All three have members who are directly subject to the two rules' requirements. *See* Appx. A1-A8; A.R.3161:1 nn.1-2 (MFA and NAPFM Comment, July 21, 2023); A.R.2080:1 n.1 (AIMA Comment, Mar. 3, 2022). Those members would have standing to challenge

---

[1] The administrative record is cited as A.R.[document]:[page range].

the rules in their own right. *Tex. Ent. Ass'n* v. *Hegar*, 10 F.4th 495, 504 (5th Cir. 2021). Further, petitioners' purpose is to protect the legal and economic interests of their members, and neither the claims asserted nor the relief requested requires the participation of individual members, as petitioners seek only equitable relief. *Id.* at 504-05. Venue is proper because petitioner National Association of Private Fund Managers is incorporated and has its principal office or place of business in Texas. 15 U.S.C. § 78y(b)(1); *cf. R.J. Reynolds Vapor Co.* v. *FDA*, 65 F.4th 182, 188 & n.5 (5th Cir. 2023); *see* Appx. A1, A5.

## STATEMENT OF THE ISSUES

1.  Whether both the Securities Lending Rule and the Short Sale Rule should be vacated because the Commission, despite acknowledging the rules' substantial overlap and even adopting them on the same day, failed to consider and justify (a) their fundamentally inconsistent requirements and (b) the cumulative economic impact of both rules on short sellers and markets.

2.  Whether the Securities Lending Rule should also be vacated because (a) its disclosure requirements conflict with limits Congress placed on the disclosure of short-sale information and depart from the Commission's own prior findings without explanation, and (b) the Commission deprived the

public of a meaningful opportunity to comment on the rule it ultimately adopted.

3.    Whether the Short Sale Rule should also be vacated (a) due to the Commission's failure to adequately explain why it imposed the substantial costs of an entirely new reporting regime rather than simply enhancing an existing program, and (b) insofar as the Commission purports to apply the rule extraterritorially to foreign securities listed on foreign exchanges.

## STATEMENT OF THE CASE

### A.    Short Sales And Securities Loans

Both of the challenged rules relate to the public disclosure of short sales. A short sale is a "sale of a security which the seller does not own."  17 C.F.R. § 242.200.   In a typical scenario, the investor borrows the stock from a securities lender in order to sell that borrowed stock at the current market price.[2]  Short Sale R. 75,100; *see* Sec. Lend. R. 75,663 n.301.  The investor then must later buy the stock on the open market to return it to the lender.  If the

---

[2]  This kind of loan transaction, where an investor or manager (*i.e.*, a "customer") borrows stock from a securities lender (such as a broker) to facilitate a short sale, is commonly referred to as a customer securities loan. Sec. Lend. R. 75,645.  While there are also other types of securities loans, such as when a lender (or broker-dealer) borrows stock from a "lending agent," *id.*, petitioners' challenge concerns the impact of the new public disclosure requirements on customer securities loans.

stock price declines during that period, the investor earns a return; if the stock price increases, the investor loses money. Short Sale R. 75,100.

The Commission acknowledges that, "[b]ecause of the need to borrow" stock in order "to facilitate a short sale," securities loans are a direct proxy for short sales. Sec. Lend. R. 75,705. In fact, "before effecting a short sale order in any equity security," the Commission "requires a broker-dealer" to reasonably believe it will be able to borrow the security by the time "delivery is due." *See, e.g.*, *Key Points About Regulation SHO*, SEC (May 31, 2022), https://www.sec.gov/investor/pubs/regsho.htm. Because of this proxy relationship, both "market participants" and academics "use securities lending data as a measure of short sale positions." Short Sale R. 75,155; Sec. Lend. R. 75,696, 75,704.

As the Commission and academic research widely acknowledge, short sales provide significant benefits. *See* Sec. Lend. R. 75,709-10; Short Sale R. 75,165-66. For example, short sales contribute to price efficiency and competition in the stock market because they reflect "sellers' beliefs about the true value of the company" based on their research, resulting in prices becoming more "reflective" of the stock's true value. Short Sale R. 75,163; *see* Sec. Lend. R. 75,710. Short sellers thus "play a critical role in driving the

informed prices and rational allocation of capital that passive investors depend upon." A.R.321:2 (Citadel Comment, Apr. 4, 2022).

Short sales can also positively impact companies themselves, either by signaling the market's reaction to management decisions or by uncovering and deterring bad corporate behavior. Academic studies show that corporate executives are "less likely to engage in fraud or do other things that may hurt the value" of their companies when they know that "short sellers are monitoring their actions and financial statements and are willing to expose wrongdoing." Short Sale R. 75,166; Sec. Lend. R. 75,710; *see* A.R.2323:1 (Nasdaq Comment, May 25, 2022) ("[L]egitimate short selling contributes to efficient price formation, enhances liquidity, and facilitates risk management. Evidence also shows that short sellers benefit the market and investors in other important ways, including by identifying and ferreting out instances of fraud and other misconduct at public companies.").

Engaging in the research necessary to generate these market benefits is costly. Managers must "invest resources into costly research" to identify overvalued companies or detect corporate waste or fraud. A.R.317:3 (Overdahl Comment, Apr. 1, 2022); *see* Sec. Lend. R. 75,709. As a result, such managers "seek to trade in ways that would not expose their strategies" or

investment theses in order to minimize the costs associated with establishing short positions and to avoid "copycat trading" by other investors. Short Sale R. 75,158; *see* Sec. Lend. R. 75,728. As the Commission has recognized, overly granular public disclosure of short sales can cause significant harm to investors and markets, including (a) "revealing short sellers' information that may have been acquired through fundamental research," (b) "revealing short sellers' trading strategies," and (c) "increasing the threat of retaliation against [investors] by other market participants." Short Sale R. 75,163. The result of these harms, as the Commission's Division of Economic and Risk Analysis concluded when describing the risks of a trade-by-trade short-sale reporting regime in a 2014 report prepared in response to a congressional directive, would be "harmful to price efficiency" and "may tend to reduce liquidity." *See Short Sale Position and Transaction Reporting*, SEC Division of Economic and Risk Analysis 80, 83 (June 5, 2014), https://www.sec.gov/files/short-sale-position-and-transaction-reporting0.pdf.

In short, excess disclosure ultimately makes short selling costlier, which disincentivizes the very fundamental research that contributes to price discovery and market efficiency. And the result, as "[a]cademic studies[] both theoretical and empirical" show, is that "stock prices are less reflective of

-11-

fundamental information both because costly short selling makes trading on information more difficult, and because costly short selling dissuades investors from collecting information in the first place."  Short Sale R. 75,163.

## B.    The Proposed Rules

As the Commission recognized from the outset, because both rules require public disclosure of short-sale information, they are inextricably linked.

### 1.    The Proposed Securities Lending Rule

The Commission proposed the Securities Lending Rule on November 18, 2021.  *Reporting of Securities Loans*, A.R.1, published at 86 Fed. Reg. 69,802 (Proposed Sec. Lend. R.).  The proposed rule required that, within 15 minutes, any securities loan transaction must be reported to the Financial Industry Regulatory Authority (FINRA), the self-regulatory organization for broker-dealers.  Proposed Sec. Lend. R. 69,851-52.  FINRA would then publish transaction-by-transaction data "as soon as practicable." *Id.* at 69,852.

The Commission's proposal acknowledged the direct relationship between securities loans and short sales, given that "[a] primary reason for borrowing equity shares is to facilitate a short sale."  Proposed Sec. Lend. R.

69,831.   It thus acknowledged that the proposed daily securities loan disclosures would "provide a more complete and timely picture of . . . short selling." *E.g.*, *id.* at 69,812; *see id.* at 69,804.   Despite acknowledging that "[i]ncreasing short selling transparency may make it more costly for short sellers to implement their positions," the Commission elsewhere confusingly asserted that the proposed rule would "reduce the costs of short selling." *Id.* at 69,839, 69,845.

The comment period ended on January 7, 2022.   Many commenters, including petitioners MFA and AIMA, pointed out the harmful effects of the proposed rule on short selling.   A.R.147:7 (MFA Comment, Jan. 7, 2022); A.R.127:2 (AIMA Comment, Jan. 7, 2022); A.R.105:5 (CCMR Comment, Jan. 6, 2022); A.R.130:5 (SIFMA AMG Comment, Jan. 7, 2022).   MFA explained that publicly disclosing granular transaction-by-transaction data about securities loans would be effectively the same as publicly disclosing short sales, thereby "mak[ing] it more costly to continue to build short positions and . . . inhibit[ing] market participants from doing so." A.R.147:7 (MFA Comment, Jan. 7, 2022).

### 2.    The Proposed Short Sale Rule And The Reopening Of The Securities Lending Comment Period

Three months after proposing the Securities Lending Rule, the Commission proposed the Short Sale Rule on February 25, 2022. *Short Position and Short Activity Reporting by Institutional Investment Managers*, A.R.2042, published at 87 Fed. Reg. 14,950 (Proposed Short Sale R.). That same day, the Commission reopened the comment period for the Securities Lending Rule "so that commenters may consider whether there would be any effects of [the proposed Short Sale Rule] that the Commission should consider in connection with [the proposed Securities Lending Rule]." A.R.2:4 (Sec. Lend. R. Reopening). Doing so made sense, given that—as the Commission acknowledged and commenters pointed out—both proposed rules would result in the disclosure of short-sale information.

Notably, the Commission took a much different approach to disclosures of short-sale information in the proposed Short Sale Rule. Unlike the Securities Lending proposal, which dismissed harms to the markets from public disclosure of short sales, the proposed Short Sale Rule was structured to *avoid* revealing sellers' "fundamental research," and "information about the specific trading strategies of certain short sellers," Proposed Short Sale R. 14,995, which could make them "more susceptible to short squeezes," *id.* at

14,952. Furthermore, the Commission explained, such harmful public disclosure could reduce the incentives to conduct in-depth research, which "could lead to higher incidences of fraud as [executives] feel that the likelihood of being caught goes down." *Id.* at 14,997.

In order to "mitigate" those harms, the Commission proposed to publish short-sale data on an aggregated, delayed basis. Proposed Short Sale R. 14,994. Institutional investment managers would be required to report short-sale data on a monthly basis to the Commission through its Electronic Data Gathering, Analysis, and Retrieval system (EDGAR). *Id.* at 14,955. The Commission would then only "publish aggregated information"— *i.e.*, combined data across all managers—"one month after the end of the reporting calendar month." *Id.*

The comment period concluded on April 26, 2022. Many commenters, including petitioners, viewed the Commission's general approach of publishing short-sale data on an aggregated, delayed basis as a significant improvement over the initial Securities Lending proposal and called for the Commission to harmonize the Short Sale and Securities Lending proposals. *See* A.R.3159:1 (MFA Comment, June 15, 2023); A.R.3161:15 (MFA and NAPFM Comment, July 21, 2023); A.R.2279:2 (AIMA Comment, Apr. 26, 2022).

Commenters questioned the need for the Commission to create a whole new reporting system, given that FINRA already "collects aggregate short interest information in individual securities." A.R.2279:9 (AIMA Comment, Apr. 26, 2022); *see* A.R.2282:4-7 (MFA Comment, Apr. 26, 2022); A.R.2287:3 (T. Rowe Price Comment, Apr. 26, 2022). Under that program, FINRA collects and publishes aggregate short-sale data, and FINRA had already proposed to enhance the program in mid-2021. *See* FINRA Regulatory Notice 21-19, *FINRA Requests Comment on Short Interest Position Reporting Enhancements and Other Changes Related to Short Sale Reporting* (June 4, 2021), https://www.finra.org/rules-guidance/notices/21-19. As petitioner AIMA explained, the FINRA disclosure program could simply be "enhanc[ed]" to collect the new information that the Commission sought under the proposed rule. A.R.2279:9 (AIMA Comment, Apr, 26, 2022); *see* A.R.2282:5-6 (MFA Comment, Apr. 26, 2022) ("MFA (and others) recently supported a proposal by FINRA to *increase* the frequency of both collecting and publishing short interest data from bimonthly to weekly."). Commenters also expressed concern about the apparent "cross-border application of the reporting obligation" under the proposed rule. *See, e.g.,* A.R.3150:13 (HSBC Comment, Jan. 24, 2023).

Multiple commenters also pointed out the inconsistent approaches between the two rules. Petitioner MFA explained that "the economic analysis of the Proposed [Securities Lending Rule] purports to treat the public disclosure of loan-by-loan information as an unmitigated benefit to the short selling market, even though the Commission concluded the opposite in the Proposed [Short Sale Rule]." A.R.316:3 (MFA Comment, Apr. 1, 2022). Petitioner AIMA similarly pointed out that, despite going "to great lengths to highlight the negative impacts" of overly granular disclosure in the proposed Short Sale Rule, the Commission nonetheless "fail[ed] to contemplate or examine these concerns" in the proposed Securities Lending Rule. A.R.313:3 (AIMA Comment, Apr. 1, 2022); *see* A.R.321:5-8 (Citadel Comment, Apr. 4, 2022) (In the proposed Short Sale Rule, the Commission "cataloged [the] well-documented harms associated with a transaction-by-transaction short sale public reporting regime, yet did not consider them when analyzing the [proposed Securities Lending Rule].").

With respect to the Commission's economic analysis, James Overdahl, a former SEC chief economist, explained that the Commission was required to consider the cumulative impact of these two interrelated rules: "The Commission cannot consider these rules in isolation . . . . The potential indirect

effects on the short selling market, and thus on price discovery, of the securities lending rule substantially overlap with the concerns raised in the proposed short selling rule. . . . [B]y only considering these rules in isolation, the Commission is not providing a comprehensive picture of the compliance and other direct costs." A.R.317:14-15 (Overdahl Comment, Apr. 1, 2022).

### C.   The Final Rules

Again confirming their interrelated nature, the Commission finalized both rules on the same day.  On October 13, 2023, the Commission first adopted the final Securities Lending Rule, and then adopted the final Short Sale Rule immediately thereafter.  *SEC Open Meeting Agenda* (Oct. 13, 2023), https://www.sec.gov/os/agenda-open-101323.

### 1.   The Final Securities Lending Rule

Like the proposal, the final Securities Lending Rule requires transaction-by-transaction, next-day public disclosure of individual securities loans. Sec. Lend. R. 75,648.  Lenders must report granular information about the borrowed security and terms of the loan at the end of each day, including:

- the name of the issuer of the security;

- information identifying the security (such as ticker symbol or CUSIP);

- the date and time the loan was effected;

- the name of the platform or venue where the loan was effected;

- information about the fees and rates charged for the loan;

- information about the collateral used to secure the loan;

- the termination date of the loan;

- the size of the loan; and

- whether the borrower was a customer, broker or dealer, clearing agency, bank, custodian, or "other person."

*Id.* at 75,741 (Final Rule 10c-1a(c)). The rule further requires the reporting of similar information at the end of each day when any securities loan is modified in any respect. *Id.* (Final Rule 10c-1a(d)).

The rule requires FINRA to publish nearly all of this transaction-level data the next morning, accompanied by a unique identifier that is assigned to each individual loan when made (and remains associated with the loan through any subsequent modifications). *See* Sec. Lend. R. 75,741-42 (Final Rule 10c-1a(g)). This next-day public information will reveal significant information regarding short-sale activity. The data will identify which loans are to "customers," meaning investors borrowing in connection with short sales. For those customers' loans, the public trade-by-trade data will show which stocks were shorted, the number of short-sale transactions per stock, and whether the stock is hard to borrow based on the loan rate, all on a next-day basis.

The sole exception to the next-day publication requirement relates to information about the size of each individual loan.  In a change from its proposed rule, the Commission delayed FINRA's publication of individual loan-size data until 20 business days after the loan was effected.  Sec. Lend. R. 75,742 (Final Rule 10c-1a(g)(2)).  After that time period, however, the individual loan size will be associated with the unique identifier initially assigned to the loan.  Because any future modifications to any term of that loan—including changes in size—will be published with that same unique identifier, individual positions (and corresponding short sales) can be tracked over time.

As in the proposed rule, the Commission continued to acknowledge that securities loans and short sales are "tightly linked," given that "a primary reason for borrowing shares is to facilitate a short sale."  Sec. Lend. R. 75,710, 75,696 (noting that "the majority of equity securities lending . . . occurs to facilitate short selling," which "results in a close correlation between information about aggregate Customer loan sizes and short interest").  Yet the Commission made no attempt to explain why it was requiring the next-day public disclosure of transaction-by-transaction securities loan information—

which was obviously inconsistent with the aggregate, delayed publication regime it would finalize mere minutes later in the Short Sale Rule.

Nor did the Commission attempt to assess how the data released under the two rules would impact affected parties on a cumulative basis. Instead, the Commission simply refused to consider the Short Sale Rule at all in its economic analysis. It attempted to justify that decision based on the fact that the Short Sale Rule—scheduled for finalization that same day—"remain[ed] at the proposal stage." Sec. Lend. R. 75,694-95 & n.725.

Commissioners Uyeda and Peirce issued dissenting statements. Given the "tight interrelation" between the Securities Lending Rule and the Short Sale Rule, Commissioner Uyeda stated that "changes to each of them from the proposal stage to the final rule stage need to be considered in weighing the interactive effects on their costs and benefits." Mark T. Uyeda, *Dissenting Statement on Reporting of Securities Loans* (Oct. 13, 2023), https://www.sec.gov/news/statement/uyeda-statement-securities-lending-101323. The changes to the Securities Lending Rule alone, he explained, "are qualitatively of such a nature as to warrant a re-proposal, along with an updated economic analysis." *Id.* For her part, Commissioner Peirce cut straight to the heart of the Commission's contradictory approach: "Why are

we requiring the publication of loan-by-loan data?  Why not publish aggregate data by security instead?"  Hester M. Peirce, *Dissenting Statement on Reporting of Securities Loans* (Oct. 13, 2023), https://www.sec.gov/news/statement/peirce-statement-securities-lending-101323.

### 2.    The Final Short Sale Rule

Minutes after finalizing the Securities Lending Rule, the Commission proceeded to finalize the Short Sale Rule.  This time, the Commission *rejected* public disclosure of daily, transaction-by-transaction short-sale data based on concerns about the harms of such disclosure on short selling, price efficiency, competition, and capital formation.  Short Sale R. 75,163-65.  The Commission "continue[d] to believe" that publicly disseminating individual transaction data would increase the risks of "reveal[ing] a reporting Manager's trading strategies" and exposing "potentially vulnerable short positions."  *Id.* at 75,132.  Such information would "make it easier for a market participant to deduce the identity of a reporting Manager," creating a "risk of retaliation, copycat trading and other market activity that might have an undesired chilling effect on price discovery."  *Id.*  Directly contrary to the Securities Lending Rule, the Commission concluded that "the anticipated benefit of enhanced transparency" did "not justify the[se] costs."  *Id.* at 75,132-33.

The Commission thus determined that aggregated, delayed disclosure of short-sale information struck the right "balance."  Short Sale R. 75,119, 75,132.  The final rule requires any institutional investment manager that enters into short positions above a certain threshold to report data for each such security on a monthly basis.  The Commission will then aggregate the data across all managers and publish it after a month's delay.  *Id.* at 75,102.

In its economic analysis for this rule, the Commission took a different tack.  Since the Securities Lending Rule had become final moments earlier, the Commission decided it could not entirely ignore the rule in its economic analysis of the Short Sale Rule.  The Commission asserted that it would only consider the "potential economic effects arising from any *overlap between the compliance period[s]*," not any *substantive* aspects of the two rules or their cumulative economic impact on affected parties.  Short Sale R. 75,149 (emphasis added); *see id.* at 75,171 ("[W]e do not think these increased costs from overlapping compliance periods will be significant.").  The Commission's only mention of the new Securities Lending Rule disclosures was in its discussion of how the Short Sale Rule would provide even more information on top of "[e]xisting short selling data."  *Id.* at 75,154-57; *see id.* at 75,162.  In that context, the Commission explained that the securities loan disclosures, as

"another source of data covering the short selling market," would "further enhance the usefulness of" the Short Sale Rule data, because those two "data sources will have a natural relationship with each other." *Id.* at 75,158.

Finally, the Commission rejected commenters' suggestion that the Commission simply enhance the existing FINRA short-interest reporting regime instead of creating a new reporting system through EDGAR. The Commission agreed there was "overlap," but stated that, due to "differences in reporting entities, timing, and the specific data being collected" under the existing FINRA program, relying on FINRA reporting "would have provided less transparency." Short Sale R. 75,162, 75,130, 75,176. The Commission likewise declined to make changes in response to commenters' concerns about "whether the Commission's jurisdiction extended to equity securities not traded in the U.S." *Id.* at 75,109. The Commission concluded that "any institutional investment manager already subject to U.S. reporting requirements" would be required to comply with the new "regulatory reporting obligation" for both U.S. *and* foreign securities. *Id.*

Commissioners Uyeda and Peirce raised additional concerns regarding the Short Sale Rule. Both stated that "a narrower rule leveraging existing reporting requirements could have brought more meaningful transparency at

lower costs." Peirce, *Dissenting Statement on Short Sale Disclosure*, https://www.sec.gov/news/statement/peirce-statement-short-sale-101323.

Specifically, "[t]he Commission could have chosen a less burdensome approach" by building on FINRA's preexisting reporting system, which FINRA had already started a process to do in mid-2021. *Id.*; *see* Uyeda, *Dissenting Statement on Short Position and Short Activity Reporting by Institutional Investment Managers* ("There also appear to be lower cost alternatives that would involve leveraging pre-existing data efforts that might have been employed to fulfill these statutory requirements."), https://www.sec.gov/news/statement/uyeda-statement-short-sale-101323.

Both Commissioners also expressed concern about cybersecurity risks inherently associated with creating the new system utilizing the Commission's EDGAR platform, which "historically has been subject to prior breaches by intruders." Uyeda, *Dissenting Statement on Short Position and Short Activity Reporting by Institutional Investment Managers*; Peirce, *Dissenting Statement on Short Sale Disclosure* (rule was "too cavalier" about the risk of collecting "highly sensitive" data that could be exposed by "a breach of EDGAR").

## STANDARD OF REVIEW

The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

This Court's review is "searching and careful." *All. for Hippocratic Med.* v. *FDA*, 78 F.4th 210, 245 (5th Cir. 2023). In recent years, the Supreme Court has made clear that far from being "toothless," the arbitrary-and-capricious standard has "serious bite." *Wages & White Lion Invs., L.L.C.* v. *FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing *DHS* v. *Regents*, 140 S. Ct. 1891, 1907-15 (2020)). This Court ensures agency decisions are "reasonable and reasonably explained," *El Paso Elec. Co.* v. *FERC*, 76 F.4th 352, 364 (5th Cir. 2023), and that the Commission fulfills its duty to account for rules' effects on "efficiency, competition, and capital formation," 15 U.S.C. § 78c(f); *see Chamber of Com. of U.S.* v. *SEC*, 85 F.4th 760, 772 (5th Cir. 2023).

## SUMMARY OF ARGUMENT

For multiple reasons, this Court should vacate both the Securities Lending Rule and the Short Sale Rule and require the Commission to develop

a regulatory regime that is consistent and complies with its statutory obligations under the APA and the Exchange Act.

I.     The Commission's adoption of these two highly interrelated rules without considering their interaction or overlap renders both rules invalid.

A.     In a total failure of process, the Commission finalized these two highly interrelated rules on the same day after having expressly solicited comments on the effects they would have on each other—yet failed to consider whether the rules are consistent or how they interact.  That failure alone violates the APA, and the Commission's ultimate decision to adopt diametrically opposed requirements for public disclosure of the same market activity represents a clear case of arbitrary and capricious rulemaking.

B.     The Commission likewise violated its APA and statutory obligations when it declined to conduct a cumulative economic analysis of the impact of both rules in combination on affected parties, or to take any meaningful account of the impact of one rule's substantive requirements in considering the costs and benefits of the other.

II.    The Securities Lending Rule is also invalid for its own reasons.

A.     By requiring detailed, daily disclosures about individual securities loans, the Securities Lending Rule directly conflicts with Congress's directive

in Section 929X of Dodd-Frank that short-sale information should be published only on a periodic, aggregate basis. The Commission's approach in the Securities Lending Rule also conflicts with its own prior findings, without explanation for its different approach here.

B.     The Commission also violated the APA's requirement that the public have a meaningful opportunity to comment on the final rule. It made substantive changes between the proposal and the final Securities Lending Rule—including its purported cure-all of delaying the publication of individual loan-size data by 20 business days—without adequately previewing and providing a meaningful opportunity for comment on the alternatives it adopted.

III.   The Short Sale Rule likewise suffers from independent flaws that warrant setting it aside at least in part.

A.     The Commission failed to adequately explain why it rejected less burdensome alternatives. Specifically, it offered no persuasive reason why it declined commenters' suggestion to enhance FINRA's existing short-sale reporting program, and instead forced affected parties to bear the substantial costs and cybersecurity risks of an entirely new reporting system.

B.    The Court should also reject the Commission's attempt to apply the Short Sale Rule's requirements to foreign securities traded on foreign exchanges. That approach violates settled principles of extraterritoriality and makes little practical sense.

## ARGUMENT

## I.    THE SECURITIES LENDING RULE AND THE SHORT SALE RULE ARE BOTH INVALID WHEN CONSIDERED TOGETHER.

The Commission violated its obligations under the APA and the Exchange Act by adopting two highly interrelated rules without considering whether they are consistent with each other, despite expressly seeking comments on their interaction and finalizing the rules on the same day. Whether by neglect or design, the end result of that failure is the Commission's adoption of two rules that impose inconsistent disclosure requirements with respect to the same market activity, without any explanation for the glaring inconsistency.

The APA does not tolerate such rulemaking in a vacuum. It requires the Commission to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chamber of Com.*, 85 F.4th at 768 (alterations omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut.*

*Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  And it bars the Commission from "entirely fail[ing] to consider an important aspect of the problem" or relying on an "explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  As a matter of logic and common sense, the "relevant factors" that an agency must consider include any other rules issued by the agency that address the same or related topics, and it must at least offer a "satisfactory explanation" of how those rules will work in tandem. *Sw. Elec. Power Co.* v. *EPA*, 920 F.3d 999, 1013 (5th Cir. 2019).  Because the Commission failed to do so here, both rules should be vacated.

### A. The Commission's Refusal To Consider Or Justify Its Contradictory Approaches To Disclosure Of The Same Market Activity Was Arbitrary And Capricious.

1.  The Commission undertook a deeply flawed process in adopting these two rules.  Throughout the entirety of the rulemaking process, the Commission acknowledged these two rules were closely linked, because securities lending "occurs to facilitate short selling" and there is a "close correlation between information about aggregate Customer loan sizes and short interest."  Sec. Lend. R. 75,696.  When proposing the Short Sale Rule, the Commission even reopened the comment period for the Securities Lending Proposed Rule so that parties could address the overlap between the two

proposed rules. Commenters heeded that call, pointing out the inconsistent approaches and urging the Commission to harmonize the two proposals. The Commission then finalized the two interrelated rules on the same day, at the same open meeting.

Astoundingly, after all that, the Commission said *nothing* in the final rules about whether the rules' disclosure requirements are substantively consistent with each other. In its discussions of the substantive basis and justification for the disclosure requirements it adopted in each final rule, the Commission did not mention the other rule's requirements, much less consider how those rules' requirements compared to each other, as commenters had urged. The first and only time the Commission mentioned the other rule was in the economic-analysis section near the end of each release. But even there, the Commission blinded itself to substance. In the Securities Lending Rule, the Commission nonsensically declined to consider the Short Sale Rule because it "remain[ed] at the proposal stage," even though it would become final in a matter of minutes. Sec. Lend. R. 75,695. In the Short Sale Rule, the Commission considered only the "overlap between the compliance period[s]" for the two rules. Short Sale R. 75,149.

That does not cut it under the APA. The Commission's failure to "consider all relevant factors raised by the public comments and provide a response to significant points within"—here, comments the Commission *expressly requested* about the interactions between the two rules—violates core notice-and-comment principles. *Chamber of Com.*, 85 F.4th at 774; *see Perez* v. *Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to public comments received."). And there can be no question that those comments urging the Commission to adopt consistent disclosure regimes "raise[d] points which, if true and . . . adopted, would require a change in an agency's proposed rule." *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (internal quotations omitted). The two rules should be vacated for that reason alone.

2.    The Commission's failure gets worse. Perhaps the Commission did not address whether the rules are consistent because they are wildly *in*consistent. Agencies violate the APA when they take "paradoxical action[s]," *Sw. Elec. Power*, 920 F.3d at 1016, or "create[] 'unexplained inconsistencies in the rulemaking record,'" *Sierra Club* v. *EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (citation omitted). Here, the Commission acted "paradoxical[ly]" by adopting fundamentally contradictory approaches toward

public disclosure of short-sale information in two rules finalized on the same day.

Despite repeatedly recognizing that securities loans and short sales are "tightly linked," Sec. Lend. R. 75,710; *see id.* at 75,696, 75,705—and even expressly soliciting comment on the interaction between the two rules—the two rules adopt diametrically opposed approaches on critical issues:

| Topic | Short Sale Rule Approach | Securities Lending Rule Approach |
|---|---|---|
| Granularity of public data | *Aggregated* data only | *Trade-by-trade* data |
| Frequency of reporting | *Monthly* reports | *Daily* reports |
| Timing of publication | *One month* delay | *Next-day* for nearly all data (except loan size) |
| Commission conclusion | Disclosure will *increase* the costs of short selling | Disclosure will *decrease* the costs of short selling |

First, the two rules adopt directly conflicting approaches to the granularity of data that is publicly disclosed. The Short Sale Rule requires that data be *aggregated* across all managers prior to public disclosure in order to mitigate the harms associated with disclosing investment strategies. As the Commission explained, "the anticipated benefit[s] of enhanced transparency" from more individualized, transaction-by-transaction data would "not justify

the costs." Short Sale R. 75,132-33. Those costs include the "potential to reveal a reporting Manager's trading strategies," and allowing "market participant[s] to deduce the identities of individual short sellers," risking "retaliation, copycat trading and other market activity that might have an undesired chilling effect on price discovery." *Id.* at 75,132.

The Commission ignored all of that analysis and adopted the polar opposite approach in the Securities Lending Rule, requiring public disclosure of granular, trade-by-trade data. Although the Commission acknowledged that "[a]ggregate statistics would . . . reduce the risk of exposing short selling strategies," it rejected that alternative out of hand merely because it "would not provide the same transparency benefits." Sec. Lend. R. 75,726. It did not meaningfully acknowledge or discuss any of the harms the Commission identified in the Short Sale Rule with respect to the public disclosure of granular, trade-by-trade data.

Second, the two rules adopt contradictory approaches to the timing and frequency of publicly disclosing data. The Short Sale Rule provides that the data will be published on a *monthly* basis, with approximately a one-month delay. The Commission expressly rejected calls for "more frequent—i.e., daily" reporting, finding that "increasing the frequency of Commission

publication" would "increase the risk of short squeezes or other manipulative activities that could interfere with the price discovery function of equity markets." Short Sale R. 75,118-19; *see id.* at 75,131 (delayed publication "reduce[s] the risk of imitative trading activity by market participants and help[s] to protect report[ing] Managers' proprietary trading strategies").

In the Securities Lending Rule, the Commission reached the opposite conclusion, requiring that information regarding customer securities loans be reported on a *daily* basis and publicly disclosed the next morning. The Commission rejected calls for periodic reporting and delayed publication based on its assertion that "a longer reporting horizon would delay the dissemination and availability of securities loan information, potentially reducing some of the benefits of the final rule." Sec. Lend. R. 75,725. Again, there was no meaningful acknowledgement or discussion of any of the harms the Commission had just identified in the Short Sale Rule with respect to the more frequent public disclosure of short-sale data.

Third, the two rules reach fundamentally contradictory conclusions about the consequences of publicly disclosing short-sale information. In the Short Sale Rule, the Commission repeatedly explained that public disclosure of short-sale information would "*increase[]* the costs of short selling," which

"may harm price efficiency" and "lead[] to lower liquidity." Short Sale R. 75,163, 75,165 (emphasis added); *see id.* at 75,166, 75,173. But in the Securities Lending Rule, the Commission concluded the opposite for the public disclosure of much more granular trade-by-trade data the next day. Without any explanation, the Commission asserted that "increased transparency . . . will *lower* the cost of short selling." Sec. Lend. R. 75,707 (emphasis added). That contradiction is the definition of "paradoxical" rulemaking.

3.     In the Securities Lending Rule, the Commission's sole nod to the concerns that drove its decisionmaking in the Short Sale Rule was delaying the publication of a single data point—loan size—for 20 business days. Sec. Lend. R. 75,665, 75,690, 75,709-10. But the Commission never explained why it believed that one particular adjustment would be a panacea, despite concluding that a radically more protective approach was necessary in the Short Sale Rule. Nor did it seek comment from affected parties on that view, *see infra* section II.B.

And it is no panacea. Had the Commission allowed comment on this adjustment, it would have learned that the remaining data points published on a next-day basis alone will reveal significant and sensitive information about short-sale activity, including which stocks are shorted each day, the number of

short-sale transactions for each stock, and the aggregate size of short activity for each stock. Moreover, because even the delayed publication of the individual loan size will be associated with the individual loan's unique identifier—which will likewise accompany all future modifications to that loan, including its size—those individual loans and corresponding short sales can be tracked over time, exposing significant information about specific investment strategies.

The Commission acknowledged that the delayed individual loan-size data "could provide information about short sellers' strategies" once published, including by revealing "distribution of short sentiment, *i.e.*, whether short interest is concentrated among a few short sellers" or "spread out over many short sellers," and "indication[s] about when individual market participants increased or decreased their short positions." Sec. Lend. R. 75,711. That is precisely why the Commission did not require *any* trade-by-trade data to be publicly disclosed in the Short Sale Rule, regardless of the timing of publication.

Despite having taken those concerns seriously in the Short Sale Rule, the Commission wrote them off in the Securities Lending Rule by asserting that the data would be "noisy." Sec. Lend. R. 75,711. This was because, the

Commission claimed, market participants would have to "examine" the data "to try to identify factors that may be indicative of short selling." *Id.* That is not correct. It would require little effort to identify the loans corresponding to short sales, because the securities-loan data will easily reveal which loans are related to short sales by identifying "customer" loans. As the Commission itself recognized in the Short Sale Rule, "[b]y aggregating the total amount of shares on loan in the 'customer' category, market participants could likely estimate outstanding short interest with considerable accuracy." Short Sale R. 75,156.

In sum, the Commission did not even acknowledge the divergent approaches it was adopting between the two rules, much less attempt to explain or reconcile them, despite commenters' pleas. Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Com. of U.S.* v. *Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018); *see Texas* v. *EPA*, 91 F.4th 280, 299 (5th Cir. 2024); *Sw. Elec. Power*, 920 F.3d at 1016. This Court should set these rules aside and send the Commission back to the drawing board to develop a coherent approach to the public disclosure of short-sale information.

**B.**    **The Commission's Refusal To Assess The Cumulative Economic Impact Of The Two Interrelated Rules Violated The Exchange Act And The APA.**

The Commission's failure to conduct a full assessment of the combined economic impact of these two interrelated rules likewise requires vacatur. The Exchange Act mandates that, whenever "the Commission is engaged in rulemaking," it must "consider or determine whether an action is necessary or appropriate in the public interest" and "whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f); *see Chamber of Com.*, 85 F.4th at 772. This statute requires the Commission "to determine as best it can the economic implications of the rule it has proposed," *Chamber of Com. of U.S.* v. *SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005), and the Commission's "failure to 'apprise itself . . . of the economic consequences of a proposed regulation' makes promulgation of the rule arbitrary and capricious," *Bus. Roundtable* v. *SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (quoting *Chamber of Com.*, 412 F.3d at 144).

1.    Here, the Commission violated its statutory obligation to conduct its "best" economic assessment when it declined to conduct a full, cumulative analysis of the costs and benefits of these two interrelated rules in either rule's economic analysis. Again, it was no secret that these two rules were closely

linked. Numerous commenters (including a former SEC chief economist) urged the Commission that it could not "consider these rules in isolation because of the potential costs of regulatory accumulation." A.R.317:14-15 (Overdahl Comment, Apr. 1, 2022). If it declined to consider the cumulative impact of the two rules in its economic analysis, the Commission would not be able to "provid[e] a comprehensive picture of the compliance and other direct costs." *Id.*

Yet that is precisely what the Commission did. In the Securities Lending Rule, the Commission refused to consider anything about the Short Sale Rule in its economic analysis. It instead asserted that the economic effects of the Short Sale Rule were irrelevant, because that rule "remain[ed] at the proposal stage"—even though the Short Sale Rule was due to be (and was) finalized immediately thereafter. Sec. Lend. R. 75,695. For its part, the Short Sale Rule's economic analysis stated that it would address only the "potential economic effects arising from any *overlap between the compliance period[s]*" of the two rules, not the substance. Short Sale R. 75,149 (emphasis added). The Commission concluded that it "d[id] not think these increased

costs from overlapping compliance periods will be significant." *Id.* at 75,171.[3]
That is the sum total of the Commission's analysis of the cumulative economic
impact of the two rules.

The Commission's failure to consider the rules' cumulative impact
departs from how the Commission itself, across different administrations, has
consistently understood its obligations when assessing interrelated rules
adopted on the same day.  In the past, the Commission has correctly
characterized interrelated rules finalized at the same open meeting as being
"concurrently" adopted, and accordingly has in each of those rules
substantively analyzed the economic effects of both rules together, and in a
manner that consistently accounts for common costs and benefits across the
rules.  *See, e.g.*, *Regulation Best Interest: The Broker-Dealer Standard of
Conduct*, 84 Fed. Reg. 33,318, 33,321 & n.21 (July 12, 2019); *Investment
Company Reporting Modernization*, 81 Fed. Reg. 81,870, 81,985 (Nov. 18,
2016) (same).  In 2019, for example, the Commission finalized Regulation Best

---

[3]  As noted, the Short Sale Rule discusses the new Securities Lending Rule
disclosures for the purpose of establishing that the Short Sale Rule would
provide additional information and benefits on top of "[e]xisting short selling
data."  Short Sale R. 75,154-57; *id.* at 75,162.  But that limited discussion
plainly does not constitute a full cumulative economic analysis of the two rules'
costs and benefits in combination.

Interest and Form CRS at the same open meeting, in that order. *SEC Open Meeting Agenda* (June 5, 2019), https://www.sec.gov/news/openmeetings/ 2019/agenda060519.htm. In the economic analysis of Regulation Best Interest, the Commission addressed comments and an industry survey estimating the joint "costs of Regulation Best Interest and Form CRS." 84 Fed. Reg. at 33,437. Then in the economic analysis of Form CRS, the Commission addressed Regulation Best Interest and explained why it was adopting a "definition" in Form CRS that "differs" from a similar definition in Regulation Best Interest. *Form CRS Relationship Summary; Amendments to Form ADV*, 84 Fed. Reg. 33,492, 33,593 (July 12, 2019). The Commission mentioned the interplay between the two rules hundreds of times across both releases, identified and explained substantive inconsistencies, and assessed the rules' cumulative impact.

The Commission took the same approach in 2016, when it finalized three interrelated rules at the same open meeting—after reopening the comment period for one rule when proposing the others, just as it did here. *SEC Open Meeting Agenda* (Oct. 13, 2016), https://www.sec.gov/news/openmeetings/ 2016/agenda101316.htm; 81 Fed. Reg. at 81,872 n.11. Again, rather than ignore "subsequently" finalized rules as the Commission did here, it

considered them jointly in each rule's economic analysis.  In the Reporting Modernization rule's economic analysis, the Commission decided against certain disclosures in part for reasons it "discussed further in the [Liquidity Risk Management Programs rule]" that it "adopt[ed] concurrently" (and which was finalized second). 81 Fed. Reg. at 81,985.  Then in the economic analysis of Liquidity Risk Management Programs, the Commission's discussion of costs "track[ed] the assumptions made in ... Reporting Modernization."  *Investment Company Liquidity Risk Management Programs*, 81 Fed. Reg. 82,142, 82,250 n.1184 (Nov. 18, 2016); *see Investment Company Swing Pricing*, 81 Fed. Reg. 82,2084, 82,123 & nn.434-435 (Nov. 18, 2016) (third finalized rule substantively addressing second finalized rule in economic analysis).

There is no apparent justification for the Commission's failure to follow that same approach here.  The Commission's economic analysis of the Securities Lending Rule ignored the Short Sale Rule, and thus conducted an entirely one-sided cost-benefit analysis that contradicts the Short Sale Rule. And then in the Short Sale Rule, the Commission limited its analysis to "compliance periods" and a discussion of the supposed additional benefits from the Short Sale Rule.  What the agency failed to do was conduct a full and

consistent assessment of the cumulative economic impact—and the combined costs and benefits—of the new disclosures under both rules. The Commission's refusal to conduct that analysis in either rule amounts to a "failure to 'apprise itself . . . of the economic consequences of '" these two rules that warrants vacatur. *Bus. Roundtable*, 647 F.3d at 1148 (quoting *Chamber of Com.*, 412 F.3d at 144).

2.    The impact of the two rules cannot be artificially assessed in isolation.   In the real world, the disclosures will accumulate:  as the Commission itself admitted, "[w]hile the timing of the data being received may be asynchronous," the two data sets "have a natural relationship with each other," and can be "combined" to "match securities lending with actual short positions taken." Short Sale R. 75,158. The Commission's failure to conduct a holistic economic analysis meant that it never considered the effects of the "combined" data. That is of critical importance in this context, because even the Commission agrees that disclosure of short-sale information can harm markets by discouraging short selling. The "combined" data will particularly affect institutional investment managers that spend significant resources on developing and building out short positions through fundamental research.

To give just one example, the Commission intentionally designed the Short Sale Rule thresholds to capture more substantial short positions that may be the product of fundamental research.  A copycat trader could use the Short Sale Rule disclosures to identify those substantial short positions.  Then, through the Securities Lending Rule disclosures, the trader can examine loans associated with those stocks to identify how many managers shorted each one and track how those short positions were modified over time.  *See* Short Sale R. 75,156.  The combined data will thus provide more clues about the identity of those managers and their investment strategies than would have been possible under either rule by itself.

These risks are especially heightened if only one manager adopts a short position that exceeds the threshold on a particular stock.  (That would not be a rare occurrence:  "The Commission estimates that 39 percent of stocks . . . would only have one Manager above" one of the reporting thresholds.  Short Sale R. 75,160.)  As the Commission acknowledged, market participants may be able to use the Securities Lending Rule data to identify whether the Short Sale Rule data is attributable to a single manager.  *See id.* at 75,164 n.635.  In that circumstance, the Short Sale Rule disclosures could then be used to examine historical "activity data to extract information about the specific

trading strategies" the manager employed and seek to anticipate and profit off those strategies going forward. *Id.* at 75,164.

The Commission's failure to study any of these costs and weigh them against the purported benefits violated the Commission's obligations under the Exchange Act and the APA.

## II.   THE SECURITIES LENDING RULE IS INVALID IN ITS OWN RIGHT.

Even assessed in isolation, the Securities Lending Rule should be set aside under the Exchange Act and the APA.  First, the Securities Lending Rule's effective public disclosure of short-sale data on a daily, trade-by-trade basis conflicts with Congress's explicit directive that short-sale data be disclosed only on an aggregated and delayed basis.  This new approach also deviates without explanation from longstanding positions the Commission has taken in the past.  Second, the Commission finalized the new disclosure requirements without giving the public a meaningful opportunity to comment on the approach the Commission ultimately imposed.

### A.   The Securities Lending Rule Is Contrary To Law And Inexplicably Departs From The Commission's Prior Position.

Congress specifically addressed the appropriate level of disclosure of short-sale information in Section 929X of Dodd-Frank.  There, Congress

directed the Commission to publish only the "*aggregate* amount of the number of short sales of each security," and to do so after a "reporting period" that could span up to a "month." 15 U.S.C. § 78m(f)(2) (emphasis added). Congress's choice of aggregate, periodic reporting was an intentional one. In a prior draft of the law, Congress considered but removed a provision that would have required investment managers to report transaction-level information regarding short sales to the Commission "on a daily basis." H.R. 4173 § 7422 (Dec. 11, 2009). Congress was keenly aware of the distinction between a trade-by-trade, daily reporting regime and the aggregate, periodic disclosure regime it ultimately adopted.

The Commission adopted the Securities Lending Rule pursuant to a different section—Section 984(b)—of the Dodd-Frank Act, which instructs the Commission to "promulgate rules that are designed to increase the transparency of information available" about "the loan or borrowing of securities." Pub. L. 111-203, sec. 984(b) (codified at 15 U.S.C. § 78j note). Although this provision addresses securities loans, as discussed extensively above and in the Commission's own rules, securities loans to customers are direct proxies for short sales—meaning disclosures of the former are effectively disclosures of the latter.

Congress therefore made a specific determination that short-sale information should only be publicly disclosed on an aggregate, periodic basis. The Commission cannot contravene that congressional determination by mandating the disclosure of a proxy for that same information on a daily, transaction-by-transaction basis under a separate, more general section in the same title of the same statute. "Absent some clear intention to the contrary, . . . a specific statute will not be controlled by a general one regardless of the priority of enactment." *MCorp Fin., Inc.* v. *Bd. of Governors Fed. Rsrv. Sys. of U.S.*, 900 F.2d 852, 856-57 (5th Cir. 1990) (citing *Crawford Fitting Co.* v. *J.T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987)); *see Jones* v. *Hendrix*, 599 U.S. 465, 478 (2023) (courts construe separate statutory provisions "in harmony," not in a way that "set[s] them at cross-purposes").

The Commission could have adopted a disclosure regime in the Securities Lending Rule that "increased the transparency of information" about securities lending as contemplated by Section 984(b), while still acting within the limits Congress set on the disclosure of short-sale data in Section 929X. As one obvious example, the Commission could have accepted commenters' requests to adopt the same aggregate, monthly-delayed disclosures for customer securities loans that it adopted for the corresponding

short sales. The Commission's decision instead to require daily, transaction-level public disclosure of granular data about customer securities loans, even after repeatedly acknowledging that those loan transactions serve as direct proxies for short sales, directly conflicts with Section 929X.

If that were not enough, the Commission's decision to require disclosure of granular, trade-by-trade information about short sales also conflicts with the agency's own past determinations. When the Commission's Division of Economic and Risk Analysis produced a report in response to Congress's directive in Dodd-Frank to study different short-sale transaction reporting regimes, that report made clear that real-time publication of trade-by-trade short-sale data could be "harmful to price efficiency" and "may tend to reduce liquidity." *Short Sale Position and Transaction Reporting* at 83. And the Commission's prior practice was consistent with the report's recommendation: "most currently available sources of short selling information only contain information about *aggregated* short selling activity." Sec. Lend. R. 75,711 (emphasis added). Despite citing the report twice in the final rule, *see id.* at 75,705 n.824, 75,728 n.1090, the Commission never explained why it has now decided to disregard its earlier findings. *See FCC* v. *Fox Television Stations,*

*Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

## B. The Commission Deprived The Public Of A Meaningful Opportunity For Comment.

The Commission likewise failed to comply with the APA's procedural requirements in adopting the Securities Lending Rule. To ensure informed decisionmaking, the APA requires agencies to "give interested persons an opportunity to participate in" rulemaking. 5 U.S.C. § 553(c). The "opportunity for comment must be a meaningful opportunity," sufficient to ensure that "agency regulations are tested via exposure to diverse public comment" and "affected parties" are treated fairly. *Prometheus Radio Project* v. *FCC*, 652 F.3d 431, 449-50 (3d Cir. 2011). As part of that requirement, an agency's proposal "must describe the range of alternatives being considered with reasonable specificity"; "merely informing the public, in a generic sense, of the broad subjects and issues the Final Rule would address is insufficient." *Mock* v. *Garland*, 75 F.4th 563, 584 (5th Cir. 2023).

Here, the Commission deprived affected parties of a meaningful opportunity to comment when it made several changes to the proposed Securities Lending Rule and then immediately finalized it, rather than issuing a "re-proposal, along with an updated economic analysis," in order to obtain

"public feedback on this new set of regulatory and policy choices." Uyeda, *Dissenting Statement on Reporting of Securities Loans*. Most problematically, in its sole gesture toward the many comments about the harmful effects that the new public disclosures would impose on markets, the Commission announced in the final rule that it would delay publication of a single data point—the exact size of an individual securities loan—until 20 business days after the loan is effected. That half-measure, which is still inconsistent with the Short Sale Rule, "operates a rug-pull on the public" because it was never previewed with "reasonable specificity." *Mock*, 75 F.4th at 584.

Had the Commission proposed this alternative, commenters would have explained that the Commission was wrong to suggest that delaying public disclosure of loan-size information for 20 days mitigates concerns regarding copycat trading, manipulation, and retaliation. Affected managers had no chance to explain to the Commission that, in light of the substantial, trade-by-trade data that would otherwise be disclosed under the Securities Lending Rule, delaying disclosure of this one data point (out of all the others) for 20 business days would not prevent the substantial harms posed to short sellers and the markets as a whole. The remaining data points published on a next-

day basis will reveal significant and sensitive information about short-sale activity, and the delayed loan-size data will provide even more information about short sellers' strategies. *See supra* pp. 36-38, 44-45.

The Commission did not fulfill its obligation to allow meaningful public comment before finalizing the rule by posing nearly 100 multi-part, generalized, high-level questions to the public in the Securities Lending Proposed Rule. Even if the provisions of the final rule could be said to fall within one of the enormous number of open-ended questions in the proposal, this tactic plainly does not "apprise fairly an interested party" of the agency's intentions. *United Steelworkers of America, AFL-CIO-CLC* v. *Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987). For instance, in *Prometheus*, the court considered a proposed rule that asked "whether cross-ownership limits should vary 'depending upon the characteristics of local markets,' and, 'if so, what characteristics should be considered . . . ?'" 652 F.3d at 450. The court held that this was "too open-ended to allow for meaningful comment on the [FCC]'s approach," because it did not specify "which characteristics the [FCC] was considering or why." *Id.*

The Commission did the same thing here. For instance, it requested "comment on whether making the information . . . publicly available as soon as

practicable provides sufficient transparency in the securities lending market or whether such information should be published in a shorter or longer time frame." Proposed Sec. Lend. R. 69,821. That question (and others) did not provide fair warning of the specific alternative of publishing one particular data point on a 20-business-day delay.

That is particularly true given that, when the Commission decided to reopen the comment period for the proposed Securities Lending Rule when proposing the Short Sale Rule, it *still* gave no guidance to the public about how it was considering addressing the two interrelated rules. *See Michigan* v. *EPA*, 213 F.3d 663, 692 (D.C. Cir. 2000) ("vague and conflicting signals" regarding an agency's path are insufficient to provide notice under the APA). In these circumstances, the Commission did not meet its obligation to give the public fair notice and a meaningful opportunity to comment on critical alternatives.

## III. THE SHORT SALE RULE IS INVALID IN ITS OWN RIGHT.

The Short Sale Rule likewise suffers from flaws that render it unlawful on its own. First, the Commission never adequately explained why it chose to create an entirely new system of reporting short-sale data directly to the Commission, rather than adopt commenters' suggestion to simply enhance the

existing FINRA short-sale reporting program, sparing substantial costs and cybersecurity risks.  Second, the Commission's apparent intention to apply the new reporting requirements to short sales of foreign securities traded on foreign exchanges violates basic extraterritoriality principles.

### A.    The Commission Did Not Reasonably Explain Why It Refused To Adopt A Less Burdensome Alternative.

As the Commission acknowledged in the Short Sale Rule, this is not the first system to collect and publish information about short sales.  Among others, FINRA and securities exchanges already publish short-sale data.  In particular, FINRA's existing program already collects and publishes much of the information that the Commission now seeks under the Short Sale Rule, and FINRA had just recently considered and invited comments on enhancements to that program.  As Commissioner Peirce explained, utilizing and building upon FINRA's existing program would have been "a less burdensome approach" than creating an entirely new regime of reporting directly to the Commission through its EDGAR system.  Peirce, *Dissenting Statement on Short Sale Disclosure*.

The Commission failed to meet its obligation to consider an "alternative way of achieving" its objectives by enhancing the existing FINRA program. *State Farm*, 463 U.S. at 48.  Here, numerous commenters identified the

existing FINRA reporting program as a less costly alternative to the Commission's proposed rule, given that FINRA "currently collects aggregate short interest information in individual securities." A.R.2279:9 (AIMA Comment, Apr. 26, 2022); *see, e.g.*, A.R.2282:4-7 (MFA Comment, Apr. 26, 2022); A.R.2287:3 (T. Rowe Price Comment, Apr. 26, 2022). Building on that program, Commissioner Peirce observed, would have "reduced or eliminated the costs of duplicative (and potentially confusing) reporting of similar data" across multiple platforms. Peirce, *Dissenting Statement on Short Sale Disclosure.*

For its part, the Commission acknowledged all of this. It recognized that it could have required FINRA's members (*i.e.*, brokerage firms) to report short positions from individual institutional investment managers, which FINRA could then compile and publish. Short Sale R. 75,176. And it conceded that this alternative "would have reduced costs to market participants relative to the [rule]," which requires adoption of and compliance with an entirely new, separate system. *Id.*

But the Commission proceeded to reject this approach for reasons that do not make sense. While it acknowledged that there "is overlap" between the "FINRA short interest data" and the information covered by the rule, the

Commission stated that there are "differences in reporting entities, timing, and the specific data being collected" by FINRA when compared to the new requirements under the rule.  Short Sale R. 75,162, 75,130.  Specifically, the Commission stated that "FINRA short interest data includes short interest for all short sales known to clearing broker-dealers" and "does not provide the Commission or the public with daily information on short sellers' activities." *Id.* at 75,162.  The Commission thus deemed FINRA reporting an inadequate alternative, claiming that it "would have provided less transparency." *Id.* at 75,176.

That explanation misses the obvious point:  the data that FINRA *currently* collects is irrelevant to whether *modifying* what FINRA collects would accomplish the Commission's stated goals in a more cost-effective manner.  Commissioner Peirce and numerous commenters pointed out that the FINRA reporting requirements certainly "could have been enhanced to" capture the data that the Commission now seeks.  Peirce, *Dissenting Statement on Short Sale Disclosure*; *see* A.R.2279:9 (AIMA Comment, Apr. 26, 2022) ("enhanc[ing]" the "FINRA reporting regime" by "accelerat[ing]" the timing of reporting and altering the reporting requirements would "address the limitations the Commission believes exists").

Indeed, just months before the Commission proposed the Short Sale Rule, FINRA sought comment about potential enhancements to its reporting requirements that might "improve the usefulness of short sale-related information" for itself, "regulators, investors, and other market participants." FINRA Regulatory Notice 21-19.  The Commission never explained why it could not simply alter the existing FINRA program to provide for collection and public disclosure of the information it thought appropriate.

The Commission's decision does not only saddle investment managers with the financial costs of creating an entirely new reporting system.  As both Commissioners Uyeda and Peirce explained, the creation of a new, separate reporting regime creates another opportunity for this highly confidential data to be improperly accessed by bad actors—in this case, through an SEC database (EDGAR) that "historically has been subject to prior [cybersecurity] breaches by intruders."  Uyeda, *Dissenting Statement on Short Position and Short Activity Reporting by Institutional Investment Managers*; Peirce, *Dissenting Statement on Short Sale Disclosure*.  Commenters echoed those concerns.  *See, e.g.*, A.R.2286:4 (Two Sigma Comment, Apr. 26, 2022) (These concerns "unfortunately, [are] not hypothetical, as the SEC's systems have been subject to successful attacks in the past.  In 2016, the SEC disclosed that

individuals had illicitly accessed its EDGAR system."); A.R.2279:14 (AIMA Comment, Apr. 26, 2022). Even the Commission acknowledged that "the costs of a data breach could be substantial," which would include "trading losses," "business disruptions," "data breach response costs," and "reputational harm." Short Sale R. 75,172. Given the unquestioned sensitivity of the short-sale data at issue, that enhanced cybersecurity risk weighs heavily against the Commission's selected approach. The Commission failed to explain why it chose to increase that risk by creating a new reporting system instead of merely enhancing an existing one.

## B. The Short Sale Rule Cannot Apply Extraterritorially To Short Sales Of Foreign Securities Traded On Foreign Exchanges.

Lastly, this Court should also reject the Commission's apparent view that it can require disclosures of short-sale activity for securities with no connection whatsoever to the United States. Under "longstanding principle[s] of American law," laws of Congress and regulations implementing them are "meant to apply only within the territorial jurisdiction of the United States," "unless a contrary intent appears." *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotations omitted). When commenters questioned whether the Commission purported to apply the Short Sale Rule to foreign securities traded on non-U.S. exchanges, the Commission—

supposedly applying *Morrison*'s extraterritoriality principles—cryptically explained that all of the rule's reporting requirements "apply to any institutional investment manager already subject to U.S. reporting requirements." Short Sale R. 75,109. That view misinterprets *Morrison* and lacks common sense.

On the Commission's view, once a manager must comply with unspecified "U.S. reporting requirements" for *any* aspect of its operations, the rule requires that manager to report (and the Commission to ultimately publish) *all* of its short-sale activity around the globe, regardless of where the trades occur or what securities are involved. And it gets worse than that: the rule's reporting obligations apply not only to the manager's own accounts, but also to any accounts over which "any other person under the Manager's control" has investment discretion. Short Sale R. 75,105. As a result, according to the Commission, the rule would require reports of short sales that occur anywhere in the world when, for example:

- a U.S. manager shorts a foreign security on a foreign exchange;

- a U.S. manager serves as a subadviser to a foreign fund and that foreign fund shorts a foreign security on a foreign exchange;

- a U.S. manager controls an affiliated foreign manager that exercises investment discretion over a foreign fund and shorts a foreign security on a foreign exchange; or

- any *non*-U.S. manager, because of any services it may provide to some small number of U.S. clients, is required to file any reports with the Commission.

The Commission's attempt to impose a global short-sale reporting regime is at odds with well-established extraterritoriality principles. *Morrison* and its progeny set forth a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc.* v. *Eur. Cmty.*, 579 U.S. 325, 337 (2016). First, a court must determine whether the statute rebuts "the presumption against extraterritoriality" by giving "a clear, affirmative indication that it applies extraterritorially." *Id.* Second, if not, then the court determines whether the captured conduct "involves a domestic application of the statute" by identifying the "focus" of the statute and determining whether the "conduct relevant to the statute's focus" occurred in the United States. *Id.* In other words, simply pointing to *some* relevant U.S. conduct does not establish a permissible domestic application of a statute. *See Morrison*, 561 U.S. at 266 ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.").

The Commission's attempt to extend Section 13(f)(2) to foreign trading activities is plainly invalid under this framework. First, Section 13(f)(2) gives

"no clear, affirmative indication that it applies extraterritorially." *RJR*, 579 U.S. at 337. Section 13(f)(2) states in full: "The Commission shall prescribe rules providing for the public disclosure of the name of the issuer and the title, class, CUSIP number, aggregate amount of the number of short sales of each security, and any additional information determined by the Commission following the end of the reporting period. At a minimum, such public disclosure shall occur every month." 15 U.S.C. § 78m(f)(2). Nothing in that text gives any hint that Congress intended it to apply extraterritorially, much less a "clear, affirmative indication" that rebuts the presumption.

Second, the "focus" of Section 13(f)(2) is the reporting of short sales of *U.S.* securities traded on *domestic* exchanges. Section 13(f)(2) references publication of a security's "CUSIP number," which is a unique identifier assigned overwhelmingly to *U.S.* stocks and bonds. *See* 15 U.S.C. § 78m(f)(1) (also centering the Commission's authority to mandate reporting of U.S. securities on CUSIP numbers). Other provisions of Section 13 likewise focus on domestic securities, including Section 13(d)(1), *see* 15 U.S.C. § 78m(d)(1), which references different types of U.S. securities, such as registerable and exempt securities under the U.S. registration statute, 15 U.S.C. § 78*l* (generally requiring registration for securities on a "national securities

exchange"). As the Supreme Court explained in *Morrison*, Section 78*l* was never intended to authorize regulation of securities listed on "*foreign securities exchanges.*" *Morrison*, 561 U.S. at 267 (emphasis in original) (citing 15 U.S.C. § 78*l*(a)).

The Commission's explanation for its view that Section 13(f)(2) authorizes application of the rule to non-U.S. securities across the world is unpersuasive. The Commission stated that it "understands [S]ection 13(f)(2), by its terms, to apply to any institutional investment manager already subject to U.S. reporting requirements." Short Sale R. 75,109. According to the Commission, "[t]his indicates that the relevant domestic conduct under section 13(f)(2) is being an institutional investment manager operating in the U.S. securities markets such that the investment manager is subject to filing reports with the Commission." *Id.* That makes no sense. The "focus" of Section 13(f)(2) is on disclosing short sales, not "being an institutional investment manager." And as explained above, all textual indications within and surrounding Section 13(f)(2) confirm that it applies only to *U.S.* securities. The Commission identified no basis to conclude that short sales of *foreign* securities on *foreign* exchanges is "relevant to [Section 13(f)(2)'s] focus." *RJR*, 579 U.S. at 337.

Notably, the Commission itself previously took that view regarding short-sale disclosures. The prior Form SH, which the Commission used to set the reporting thresholds for the Short Sale Rule, applied to short sales of "Section 13(f) securities," as "described in Section 13(d)(1)," "that are admitted to trading on a national securities exchange"—*i.e.*, securities listed on domestic exchanges. *Guidance Regarding the Commission's Emergency Order Concerning Disclosure of Short Selling* (Sept. 24, 2008), https://www.sec.gov/divisions/marketreg/shortsaledisclosurefaq.htm; *see* 15 U.S.C. § 78m(d)(1). The Commission has not explained its change in tune, but it was right then and wrong now.

The Commission's assertion of authority to require any manager that files any report with the Commission to report its short-sale activity all over the world not only violates fundamental extraterritoriality principles, but also makes little sense as a practical matter. Because the substantial majority of short sales of foreign securities are presumably conducted by foreign managers that do not report to the Commission, the publicly disclosed information about foreign securities would be so incomplete as to be misleading. *Cf. Merck & Co.* v. *Dep't of Health & Hum. Servs.*, 962 F.3d 531, 540 (D.C. Cir. 2020) ("Generating potentially harmful confusion through

disclosures to the general public of information that is largely disconnected from Medicare and Medicaid pricing is not a plausible means of administering the programs.").  And the Commission made no effort to assess the costs of reporting foreign short sales, or the potential conflicts that its rule would create with other regulators that have jurisdiction over those foreign markets and require different disclosures.  The Commission thus lacks both the statutory authority and any conceivable reasoned basis to apply the Short Sale Rule's requirements to foreign securities traded outside the United States.

## CONCLUSION

The Court should grant the petition for review and vacate the orders on review.

Dated:  March 5, 2024

Respectfully submitted,

/s/ *Jeffrey B. Wall*

JEFFREY B. WALL
JUDSON O. LITTLETON
MADELINE B. JENKS
COOPER F. GODFREY
SULLIVAN & CROMWELL LLP
1700 New York Ave., N.W.
Suite 700
Washington, D.C.  20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I certify that on March 5, 2024, the foregoing brief was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

Dated: March 5, 2024

/s/ *Jeffrey B. Wall*
JEFFREY B. WALL

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 12,590 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Expanded BT.

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: March 5, 2024

/s/ *Jeffrey B. Wall*

JEFFREY B. WALL

*Counsel for Petitioners*

No. 23-60626

# In the United States Court of Appeals
# for the Fifth Circuit

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS;
MANAGED FUNDS ASSOCIATION;
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION,
*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of Orders of the
Securities and Exchange Commission

## APPENDIX TO OPENING BRIEF FOR PETITIONERS

JEFFREY B. WALL
JUDSON O. LITTLETON
MADELINE B. JENKS
COOPER F. GODFREY
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners*

March 5, 2024

# TABLE OF CONTENTS

| Tab | Description | Page |
|-----|------------|------|
| 1 | Declaration of Simon Lorne, on behalf of the National Association of Private Fund Managers | A1 |
| 2 | Declaration of Isaac Haas, on behalf of the National Association of Private Fund Managers | A5 |

# TAB 1

Declaration of Simon Lorne,
on behalf of the National Association of Private Fund
Managers

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | |
|---|---|
| NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; MANAGED FUNDS ASSOCIATION; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, | |
| *Petitioners*, | No. 23-60626 |
| v. | |
| SECURITIES AND EXCHANGE COMMISSION, | |
| *Respondent.* | |

## DECLARATION OF SIMON LORNE

1.    My name is Simon Lorne, and I am President of the National Association of Private Fund Managers (NAPFM), which is one of the Petitioners in this case.

2.    NAPFM is a non-profit organization whose membership is composed entirely of investment advisers in the private fund management industry.  NAPFM is a Texas non-profit corporation that is headquartered in Fort Worth, Texas.  NAPFM was founded in order to, among other things, provide education to its members and represent their legal and economic interests before the government and in the courts.  As part of this mission,

NAPFM has submitted comments on behalf of its members in rulemakings, including in the administrative proceedings below. NAPFM represents investment advisers with total net assets under management of over $600 billion as of July 2023.

3.    In addition to serving as President of NAPFM, I also serve as Senior Advisor of Millennium Management, LLC. Millennium Management is a global investment management firm and registered investment adviser with the SEC (CRD # 158117 / SEC # 801-73884). As has been publicly reported, Millennium Management is a member of NAPFM. Millennium Management has continuously been a member of NAPFM since before the Commission adopted the Securities Lending and Short Sale Rules at issue here.

4.    As an institutional investment manager, Millennium Management is directly regulated and harmed by the Short Sale and Securities Lending Rules. In particular, among other things:

(a)    The Short Sale Rule requires Millennium Management to report monthly to the SEC its end-of-month gross short positions and daily trading activity effecting its gross short position with respect to

each equity security as to which its gross short position exceeds certain thresholds set forth in the rule.  17 C.F.R. § 240.13f-2.

(b)     The Securities Lending Rule requires daily reporting to FINRA of detailed, transaction-by-transaction data regarding the loans of securities that Millennium Management uses to effect its short positions, and requires FINRA to make nearly all of that data publicly available no later than the next business day.  17 C.F.R. § 240.10c-1a.

5.     Each of these provisions requires public disclosure of information that Millennium Management does not currently make public, thereby revealing sensitive information regarding Millennium Management's short positions and trading strategies.  The public disclosure of this information increases the costs to Millennium Management of engaging in short sale trading strategies, and directly affects Millennium Management's activities in ways that impede the operation of its business, impose new costs on it, or require it to expend additional employee time.  In all of these ways, Millennium Management is directly harmed by the rules.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of March 2024 at Austin, Texas.

_____
Simon Lorne

On behalf of the National Association of Private Fund Managers

-4-

A4

# TAB 2

Declaration of Isaac Haas,
on behalf of the National Association of Private Fund
Managers

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION OF
PRIVATE FUND MANAGERS;
MANAGED FUNDS
ASSOCIATION; ALTERNATIVE
INVESTMENT MANAGEMENT
ASSOCIATION,

       *Petitioners,*

    v.

SECURITIES AND EXCHANGE
COMMISSION,

       *Respondent.*

No. 23-60626

## DECLARATION OF ISAAC HAAS

1.    My name is Isaac Haas, and I am Secretary of the National Association of Private Fund Managers (NAPFM), which is one of the Petitioners in this case.

2.    NAPFM is a non-profit organization whose membership is composed entirely of investment advisers in the private fund management industry. NAPFM is a Texas non-profit corporation that is headquartered in Fort Worth, Texas. NAPFM was founded in order to, among other things, provide education to its members and represent their legal and economic interests before the government and in the courts. As part of this mission,

NAPFM has submitted comments on behalf of its members in rulemakings, including in the administrative proceedings below.    NAPFM represents investment advisers with total net assets under management of over $600 billion as of July 2023.

3.    In addition to serving as Secretary of NAPFM, I also serve as General Counsel of HBK Capital Management.    HBK is a global investment management firm headquartered in Dallas, Texas and a registered investment adviser with the SEC (CRD # 115079 / SEC # 801-70632).    As has been publicly reported, HBK is a member of NAPFM.  HBK has continuously been a member of NAPFM since before the Commission adopted the Securities Lending and Short Sale Rules at issue here.

4.    As an institutional investment manager, HBK is directly regulated and harmed by the Short Sale and Securities Lending Rules.    In particular, among other things:

(a)    The Short Sale Rule requires HBK to report monthly to the SEC its end-of-month gross short positions and daily trading activity effecting its gross short position with respect to each equity security as to which its gross short position exceeds certain thresholds set forth in the rule.  17 C.F.R. § 240.13f-2.

(b)    The Securities Lending Rule requires daily reporting to FINRA of detailed, transaction-by-transaction data regarding the loans of securities that HBK uses to effect its short positions, and requires FINRA to make nearly all of that data publicly available no later than the next business day.  17 C.F.R. § 240.10c-1a.

5.    Each of these provisions requires public disclosure of information that HBK does not currently make public, thereby revealing sensitive information regarding HBK's short positions and trading strategies.  The public disclosure of this information increases the costs to HBK of engaging in short sale trading strategies, and directly affects HBK's activities in ways that impede the operation of its business, impose new costs on it, or require it to expend additional employee time.  In all of these ways, HBK is directly harmed by the rules.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this _4_ day of _March_ 2024 at _10: 15 am CT_ .

_Isaac Haas_

-3-

A7

On behalf of the National
Association of Private Fund
Managers