# United States Court of Appeals for the Fifth Circuit

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; MANAGED FUNDS AS-
SOCIATION; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of Rules of the
Securities and Exchange Commission

## BRIEF OF *AMICUS CURIAE* SECURITIES INDUSTRY
## AND FINANCIAL MARKETS ASSOCIATION
## IN SUPPORT OF PETITIONERS

Kevin Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS
ASSOCIATION
1099 New York Avenue, NW
Washington, DC 20001
(312) 782-0600

Mark A. Perry
  *Counsel of Record*
Robert Stern
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Mark I. Pinkert
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave.
Miami, FL 33176

*Counsel for Amicus Curiae*
*Securities Industry and Financial Markets Association*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Fifth Circuit Rule 28.2.1, counsel for *amicus curiae* Securities Industry and Financial Markets Association certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Those representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, counsel certifies that the Securities Industry and Financial Markets Association is a nonprofit corporation. It is not publicly owned and has no parent corporation.

**Amicus Curiae:**

Securities Industry and Financial Markets Association

**Attorneys for Amicus Curiae:**

Mark A. Perry
Robert Stern
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Mark I. Pinkert
WEIL, GOTSHAL & MANGES LLP

1395 Brickell Ave.
Miami, FL 33176

Kevin Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS
ASSOCIATION
1099 New York Avenue, NW
Washington, DC 20001
(312) 782-0600

**Petitioners:**

National Association of Private Fund Managers
Managed Funds Association
Alternative Investment Management Association

**Attorneys for Petitioners:**

Jeffrey B. Wall
Judson O. Littleton
Madeline B. Jenks
Cooper F. Godfrey
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC 20006
Direct: 202-956-7500
Email: wallj@sullcrom.com

**Respondent:**

Securities and Exchange Commission

**Attorneys for Respondent:**

Dominick V. Freda, Assistant General Counsel
Megan Barbero, Esq.
Vanessa Ann Countryman
Emily True Parise
Stephen Aaron Silverman
U.S. SECURITIES & EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
Direct: 202-551-5143
Email: fredad@sec.gov

Respectfully submitted,

*/s/ Mark A. Perry*
Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

# TABLE OF CONTENTS

Interest Of *Amicus Curiae* ............................................................... 1

Introduction & Summary Of Argument ........................................ 2

Argument ........................................................................................ 4

   I.  The Commission Failed To Consider The Cumulative Or Corresponding Effects Of The Rules ................................... 5

      A.  The Rules Overlap In Significant Ways ...................... 6

      B.  The Commission Arbitrarily Failed To Consider The Rules Together ........................................................ 13

   II.  The Commission's Analysis Of Benefits And Costs Was Unreasoned And Inconsistent ......................................... 19

      A.  The Commission Exaggerated The Supposed Benefits Of The Securities Lending Rule ..................... 19

      B.  The Commission's Cost Analysis Is Inconsistent ..................... 24

Conclusion ................................................................................... 30

Certificate Of Service ................................................................ 31

Certificate Of Compliance ........................................................ 32

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*All. For Hippocratic Med. v. FDA,*
    78 F.4th 210 (5th Cir. 2023) ................................................................. 18

*Am. Equity Inv. Life Ins. Co. v. SEC,*
    613 F.3d 166 (D.C. Cir. 2010) ............................................................... 22

*Bus. Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011) ......................................................... 5, 15

*Chamber of Com. of U.S. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ............................................................. 5, 5

*Chamber of Com. of U.S. v. SEC,*
    85 F.4th 760 (5th Cir. 2023) ................................................................ 4, 5

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
    45 F.4th 846 (5th Cir. 2022) ................................................................. 18

*El Paso Elec. Co. v. FERC,*
    76 F.4th 352 (5th Cir. 2023) ................................................................. 22

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.,*
    867 F.3d 564 (5th Cir. 2017) .................................................................. 4

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ...................................................... 4, 23, 30

*Michigan v. EPA,*
    576 U.S. 743 (2015) ................................................................................ 4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................ 4, 27

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) ............................................................ 24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) .............................................................................. 27

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ............................................................ 4, 15

*Venetian Casino Resort, LLC v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ............................................................ 26

*Wages & White Lion Invs., LLC v. FDA,*
    90 F.4th 357 (5th Cir. 2024) ............................................................... 18

**Statutes**

5 U.S.C. § 706 ...................................................................................... 4

15 U.S.C. § 78k-1 .................................................................................. 5

**Rules & Regulations**

*Amendments to Regulation SHO,*
    Release No. 34-61595, 75 Fed. Reg. 11,232 (Mar. 10, 2010) ................ 9

*Form CRS Relationship Summary; Amendments to Form ADV,*
    Release No. 34-86032, 84 Fed. Reg. 33,492 (July 12, 2019) ................ 16

*Investment Company Liquidity Risk Management Programs,*
    Release No. 33-10233, 81 Fed. Reg. 82,142 (Nov. 18, 2016) .............. 16

*Investment Company Reporting Modernization,*
    Release No. 22-10231, 81 Fed. Reg. 81,870 (Nov. 18, 2016) .............. 16

*Investment Company Swing Pricing,*
    Release No. 33-10234, 81 Fed. Reg. 82,084 (Nov. 18, 2016) .............. 16

*Regulation Best Interest: The Broker-Dealer Standard of Conduct,*
    Release No. 34-86031, 84 Fed. Reg. 33,318 (July 12, 2019) ................ 16

**Other Authorities**

Viktoria Baklanova at al., *Reference Guide to U.S. Repo and Secu-*
    *rities Lending Markets (Office of Financial Research Working*
    *Paper No. 15-17)* (Sept. 9, 2015),
    https://www.newyorkfed.org/medialibrary/media/re-
    search/staff_reports/sr740.pdf ................................................... 6, 7, 8, 20

Barbara Bliss et al., *Negative Activism*, 97 Wash. U. L. Rev. 1333 (2020) .................................................... 29

Cassell Bryan-Low & Suzanne McGee, *Enron Short Seller Detected Red Flags in Regulatory Filings,* Wall St. J. (Nov. 5, 2001) ............... 10

Financial Stability Board, *Securities Lending and Repos: Market Overview and Financial Stability Issues* (Apr. 27, 2012), https://www.fsb.org/wp-content/uploads/r_120427.pdf ............. 7, 8, 20

Financial Stability Oversight Council, 2020 Annual Report, https://home.treasury.gov/system/files/261/FSOC2020AnnualReport.pdf.................................................... 6

Merritt B. Fox & Kevin S. Haeberle, *Evaluating Stock-Trading Practices and Their Regulation*, 42 J. Corp. L. 887 (2017) ............ 9, 10

Jonathan M. Karpoff & Xiaoxia Lou, *Short Sellers and Financial Misconduct*, 65 J. Fin. 1879 (Oct. 2010) ................................ 10

Owen A. Lamont, *Go Down Fighting: Short Sellers vs. Firms*, 2 Rev. Asset Pricing Stud. 1 (2012) ........................................ 28

Massimo Massa et al., *The Invisible Hand of Short Selling: Does Short Selling Discipline Earnings Management?*, 28 Rev. Fin. Studies 1701 (2014) .................................................... 10

U.S. Securities and Exchange Commission, Key Points About Regulation SHO, https://www.sec.gov/investor/pubs/regsho.htm ............. 28

## INTEREST OF *AMICUS CURIAE*[1]

The Securities Industry and Financial Markets Association ("SIFMA") is the leading securities industry trade association for broker-dealers, investment banks, and asset managers operating in the capital markets. SIFMA serves as an industry-coordinating body to support and promote a strong financial industry, fair and orderly markets, informed regulatory compliance, efficient market operations, and trust and confidence in the financial markets. SIFMA routinely files *amicus* briefs in cases that are important to its members and to the functioning of the financial markets, including in this Court. *See, e.g., Nat'l Ass'n of Private Fund Managers v. SEC*, No. 23-60471 (5th Cir.).

The Securities and Exchange Commission adopted two Rules that impose new and overlapping disclosure requirements for securities lending transactions and short sales. Because the Rules will impose significant costs on market participants (including SIFMA's members) without meaningful

---

[1] No party or counsel for a party authored this brief in whole or in part and no person other than *amicus curiae*, its members, or its counsel has made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

offsetting benefits, and because the Commission failed to fulfill its responsibility under the law to adequately consider the economic effects of the Rules, SIFMA has a substantial interest in the outcome of this case.

## INTRODUCTION & SUMMARY OF ARGUMENT

On October 13, 2023, the Commission promulgated two final Rules: *Reporting of Securities Loans*, Release No. 34-98737, 88 Fed. Reg. 75,644 ("Securities Lending Rule"), and *Short Position and Short Activity Reporting by Institutional Investment Managers*, Release No. 34-98738, 88 Fed. Reg. 75,100 ("Short Sale Rule"). Although the Rules are not coextensive, they overlap in both regulatory scope and marketplace effects due to the relationship between securities lending transactions and short sales. In light of this overlap, the Commission in promulgating the Rules was obligated (1) to consider the cumulative and corresponding effect of the Rules, and (2) to offer a reasoned and consistent analysis of their costs and benefits. The Commission failed in both respects, rendering the Rules arbitrary and capricious, in violation of the Administrative Procedure Act.

*First*, the Commission acknowledged that information about securities lending transactions can allow market participants to deduce proprietary short selling strategies, resulting in significant interplay between the two

Rules. Nonetheless, the Commission refused to consider the cumulative effects of the two Rules. Specifically, it did not consider the effect of the Short Sale Rule on the Securities Lending Rule, on the ground that the Securities Lending Rule was approved and promulgated just minutes before the Short Sale Rule, which therefore "remain[ed] at the proposal stage" for those few minutes. Sec. Lend. R. at 75,695. The Commission's abnegation of its obligation to examine cumulative effects is fatal.

*Second*, the Commission's cost-benefit analysis for each Rule was unreasoned and deeply flawed. On the one hand, the Commission overstated the benefits of the Securities Lending Rule, assuming that disclosure of voluminous information about securities loans would somehow aid market participants, but failing to adequately address well-substantiated comments explaining that the Rule will actually flood the market with confusing and potentially misleading information. On the other hand, the Commission ignored or minimized costs that the Securities Lending Rule will impose by increasing the risks and burdens of short selling, even as it acknowledged and credited those same costs in the Short Sale Rule. In sum, both sides of the Commission's cost-benefit analysis were fundamentally flawed, even without accounting for the Rules' cumulative effects.

# ARGUMENT

Agency action must be "set aside" if it is "arbitrary" or "capricious." 5 U.S.C. § 706(2). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (quotation marks omitted). That review focuses on "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) (quotation marks omitted).

"[A] regulation is arbitrary and capricious if the agency failed to consider an important aspect of the problem." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (quotation marks omitted) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "This includes, of course, considering the costs and benefits associated with the regulation." *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)). In doing so, "the agency must identify benefits that bear a rational relationship to the costs imposed." *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (alteration and quotation marks omitted).

Moreover, "the Commission has a unique obligation to consider the effect of a new rule upon 'efficiency, competition, and capital formation.'" *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (quoting 15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c)). And it also must act with "due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets." 15 U.S.C. § 78k-1(a)(2). This obligation demands that the Commission "do what it can to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation before it decides whether to adopt the measure." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005); *see also Chamber of Com.*, 85 F.4th at 773 (agreeing with D.C. Circuit standard for Commission rules).

The Commission failed to discharge its rulemaking obligations here in two respects: It failed to consider the cumulative or corresponding effects of the two Rules, and it failed to offer a reasoned or consistent analysis of the costs and benefits of the Rules.

## I.   The Commission Failed To Consider The Cumulative Or Corresponding Effects Of The Rules

There is no dispute that in certain circumstances, the Rules regulate the same conduct by requiring disclosure of information relating to short sales. As such, they implicate many of the same considerations with respect to

costs, efficiencies, and market transparency. Nevertheless, the Commission refused to examine the Rules together, instead engaging in regulatory gamesmanship that is untethered from economic reality. This was arbitrary and capricious.

## A. The Rules Overlap In Significant Ways

To understand how the two Rules interact, it is necessary first to understand the relationship between securities lending transactions and short sales. As the Commission acknowledged, although these two kinds of transactions are regulated separately, they bear on one another in ways that are germane here.

**1.** A securities loan occurs when a beneficial owner of a security loans that security to a borrower. *See* Sec. Lending. R. at 75,645; *see also* Financial Stability Oversight Council, 2020 Annual Report, at 45, https://home.treasury.gov/system/files/261/FSOC2020AnnualReport.pdf; Viktoria Baklanova at al., *Reference Guide to U.S. Repo and Securities Lending Markets (Office of Financial Research Working Paper No. 15-17)*, 21 (Sept. 9, 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr740.pdf ("OFR Reference Guide"). The borrower, in exchange,

pledges collateral to protect the loan, usually in the form of cash, and pays the lender a fee in the form of interest. OFR Reference Guide at 21.

In a typical securities lending transaction, the parties bilaterally agree to the terms of the loan and then enter into a written loan agreement. *See* OFR Reference Guide at 33. Lenders and borrowers often use SIFMA's industry-standard Master Securities Loan Agreement ("MSLA") as a baseline, and negotiate specific terms such as fees, amounts, and duration. *See* SIFMA, Master Securities Loan Agreement (2017 Version), https://www.sifma.org/wp-content/uploads/2017/06/MSLA_Master-Securities-Loan-Agreement-2017-Version.pdf. The terms of a particular securities loan may depend on a number of factors, including the relationship of the parties, their creditworthiness, and the purpose of the loan. *See* Financial Stability Board, *Securities Lending and Repos: Market Overview and Financial Stability Issues* 19 (Apr. 27, 2012), https://www.fsb.org/wp-content/uploads/r_120427.pdf ("FSB Interim Report"). Often, securities loans are facilitated by an intermediary, called a "lending agent," which retains a percentage of the lender's net revenue. *See* OFR Reference Guide at 21–23, 28, 32; *see also* Sec. Lending R. at 75,645.

7

Securities loans sometimes have a fixed maturity date, but most are terminable by either party at any time during the loan period.  *See* OFR Reference Guide at 31; FSB Interim Report at 20.  While the loan remains outstanding, the securities are re-valued each business day (i.e., "marked to market") to ensure that loan is adequately collateralized.  If the value of the security decreases, the borrower may need to contribute additional cash or other collateral.  *See* OFR Reference Guide at 32; FSB Interim Report at 20.  When the loan is terminated, the borrower returns the equivalent securities (of the same issuer, class, and quantity) to the beneficial owner, and the lender returns the collateral to the borrower.  *See* FSB Interim Report at 19.

The securities lending market promotes the healthy functioning of the U.S. securities markets.  Securities lending improves global market liquidity and facilitates asset redistribution in financial markets by supporting global capital market activities and helping to ensure prompt settlement of trades.  *See* OFR Reference Guide at 21.  Securities loans also help banks manage liquidity on their balance sheets by allowing them to borrow high-quality securities to bolster their liquidity ratios.  *See* Sec. Lend. R. at 75,696.

**2.**  Short selling is a form of trading that seeks to profit off an expected decline in the value of a security.  *See* Short Sale R. at 75,151.  To effect a

short sale, an investor sells a security it does not own, which generally requires its broker to borrow the security in order to settle the transaction. *Id.* The investor pays the broker fees in exchange for carrying the short position on its books. *Id.* To close the trade, the investor repurchases the same type and amount of the securities at a later date in the open market and returns them to the broker. *Id.* If the price of the security declines, the investor will profit from the difference between the higher original sale price and the subsequent lower repurchase price. *Id.* If the price of the security increases following the short sale, the investor will suffer a loss in the amount of difference between the initial sale and subsequent repurchase. *Id.*

Short selling provides unique benefits to securities markets, as the Commission has repeatedly recognized. *See, e.g., Amendments to Regulation SHO*, Release No. 34-61595, 75 Fed. Reg. 11,232, 11,235 & n.30 (Mar. 10, 2010). For one, short selling contributes to price accuracy and efficiency in securities markets, as it ensures that both positive *and* negative information about firms are reflected in share prices. *See* Short Sale R. at 75,101 & n.5 (citing Phil Mackintosh, *How Short Selling Makes Markets More Efficient*, NASDAQ (Oct. 1, 2020), https://www.nasdaq.com/articles/how-short-selling-makes-markets-more-efficient-2020-10-01); *see also, e.g.,* Merritt B. Fox &

Kevin S. Haeberle, *Evaluating Stock-Trading Practices and Their Regulation*, 42 J. Corp. L. 887, 897–903 (2017) (discussing economic benefits from accurate securities prices). Short selling is also a key contributor to liquidity in equity markets. *See* Sec. Lend. R. at 75,710 & n.886. And short selling serves as an external "governance mechanism" and "disciplining force" for managers. Massimo Massa et al., *The Invisible Hand of Short Selling: Does Short Selling Discipline Earnings Management?*, 28 Rev. Fin. Studies 1701, 1706 (2014); *see also* Sec. Lend. R. at 75,710. It can help uncover fraud or misconduct by firms or managers, including misrepresentations in financial statements that would otherwise distort market information. *See* Jonathan M. Karpoff & Xiaoxia Lou, *Short Sellers and Financial Misconduct*, 65 J. Fin. 1879 (Oct. 2010); *see also, e.g.*, Cassell Bryan-Low & Suzanne McGee, *Enron Short Seller Detected Red Flags in Regulatory Filings,* Wall St. J. (Nov. 5, 2001).

**3.** There is undeniable overlap between the two Rules—they both require the disclosure of information that implicates short selling. That is because securities loans often facilitate the establishment of a short position. Accordingly, "securities lending data can be used to gain insight into short interest and short sentiment." Sec. Lend. R. at 75,705. Indeed, the data

disclosed under the Securities Lending Rule can provide the market with *more* information about short selling than the data disclosed under the Short Sale Rule will.

Market participants may be able to estimate short sale positions and strategies from the disclosures required by the Securities Lending Rule because of the amount of detail and the frequency of the reporting. Under the Securities Lending Rule, lenders are required to disclose numerous details about *every* individual loan transaction, and on a *daily* basis. Sec. Lend. R. § 240.10c-1a(a). Those details of each loan will include the issuer of the security, and the size, duration, and rates of the loan, among other things. *Id.* The lender will provide all of that information *at the end of each day*, and, with some exceptions, the data will be made public the following morning. *Id.* § 240.10c-1a(a), (g)(1).

The Short Sale Rule requires disclosure of the actual short sale information, i.e., the information that market participants may be able to distill indirectly from the securities lending disclosures. Under the Short Sale Rule, "Institutional Investment Managers" will be required to file a "Form SHO" with information about short sale positions—*not on a daily basis, however, but monthly*. *See* Short Sale R. § 240.13f-2(a). The Form SHO also does

not require disclosure of trade-by-trade activity (as the Securities Lending Rule does), but instead requires disclosure of details about a Manager's end-of-month gross short positions in equity securities, as well as the "net" activity in the reported equity security. *See id.*; *see also* Short Sale R. at 75,103–05, 75,188. The Commission will then publish, on a delayed basis, *aggregated* short sale information—such as the manager's gross short position in the reported equity security at the close of regular trading hours on the last settlement date of the calendar month, and the corresponding dollar value of that reported gross short position, and net activity in the reported equity security. Short Sale R. at 75,103–05.

The Commission itself agreed that the information required to be disclosed under each Rule may effectively overlap. It noted that information disclosed under the Securities Lending Rule "[could] be tracked to reveal the size and changes in individual short positions," Sec. Lend. R. at 75,705, because "activity in certain segments of the securities lending market are tightly linked to short selling positions," *id.* at 75,710; *see also id.* at 75,705 ("[S]ecurities lending data can be used to gain insight into short interest and short sentiment."). The Commission further observed that "Form SHO and Rule 10c-1a data sources will have a natural relationship with each other,"

and that this "combination of data can be useful for market reconstructions." Short Sale R. at 75,158.  And it also agreed that "[t]here is overlap between the information about stock fundamentals contained in FINRA short interest data, forthcoming Rule 10c-1a data, and the data that will be aggregated from Form SHO filings."  *Id.* at 75,162.

## B.  The Commission Arbitrarily Failed To Consider The Rules Together

Notwithstanding the undeniable (and admitted) overlap between the Rules, the Commission expressly refused to consider in the Securities Lending Rule the combined effect (and costs) of the two, simply because the Short Sale Rule was formally adopted a few minutes *after* the Securities Lending Rule.  This strategic sequencing of two related rules—in an apparent effort to avoid having to consider their cumulative costs and overlapping benefits (if any)—is the very definition of arbitrary and capricious rulemaking.

Underlying the Commission's economic analysis of the Securities Lending Rule was its assessment of the "baseline against which the costs, benefits, and the effects on efficiency, competition, and capital formation of the final rule are measured."  Sec. Lend. R. at 75,694.  The Commission's evaluation of that "baseline" considered the existing disclosure mechanisms for short sales in place as of the moment the Securities Lending Rule was

adopted. *See id.* at 75,705–06. In setting that baseline, the Commission described what it perceived as "limited" transparency with respect to short sales. *Id.*

That economic baseline did not, however, reflect reality. That is because the Commission excluded from consideration the Short Sale Rule, which was enacted later *the same day*. Sec. Lend. R. at 75,695. Because the Short Sale Rule requires disclosure of short selling data, it will enhance the amount of market transparency for short sales and thus alter the economic baseline for the Securities Lending Rule.

As the Commission's own former chief economist observed, the Commission could not "consider these rules in isolation," because "[t]he potential indirect effects on the short selling market, and thus on price discovery, of the securities lending rule substantially overlap with the concerns raised in the proposed short selling rule." AR.317:14–15 (James A. Overdahl Comment (Apr. 1, 2022)). When the Commission issued the Securities Lending Rule— and declined to consider the effect of the Short Sale Rule—it knew that it would subsequently be adopting the Short Sale Rule and that doing so would alter the economic baseline. Had it considered the Short Sale Rule, the Com-

mission would have had to acknowledge and account for the additional disclosure requirements under that rule and recalibrate its assessment of the adequacy of existing disclosure requirements, as compared to the combined costs of the new requirements.

The Commission appeared to justify its blinkered approach by the fact that the Securities Lending Rule was adopted minutes *before* the Short Sale Rule. *See* Sec. Lend. R. at 75,695. But an agency may not ignore the obvious and intended economic consequences of its own actions by resorting to regulatory gamesmanship. When promulgating regulations, an agency must offer a "consideration of the relevant factors," *Texas*, 983 F.3d at 835 (quotation marks omitted), and for the Commission, that means it must evaluate the "economic consequences of a proposed regulation," *Chamber of Com.*, 412 F.3d at 144. Plainly, the combined costs and relative benefits of two overlapping rules adopted almost simultaneously are a "relevant factor[]" informing the "economic consequences." The Commission's effort to "duck[] serious evaluation" of the economic merits of a rule is not permitted under the APA. *Bus. Roundtable*, 647 F.3d at 1152.

The Commission itself has recognized as much in the past. In 2016, for example, the Commission approved three related rules at a single meeting,

and considered the cumulative and corresponding effects of the rules on each other, and in fact altered one of the proposed rules based on that joint analysis. *See Investment Company Reporting Modernization*, Release No. 22-10231, 81 Fed. Reg. 81,870, 81,985 (Nov. 18, 2016); *Investment Company Liquidity Risk Management Programs*, Release No. 33-10233, 81 Fed. Reg. 82,142, 82,250 n.1184 (Nov. 18, 2016); *Investment Company Swing Pricing*, Release No. 33-10234, 81 Fed. Reg. 82,084, 82,123 & nn.434–35 (Nov. 18, 2016). The Commission did the same thing again in 2019, when it assessed the joint costs of two proposed regulations and addressed any perceived inconsistencies between the two. *See Regulation Best Interest: The Broker-Dealer Standard of Conduct*, Release No. 34-86031, 84 Fed. Reg. 33,318, 33,3212 & n.21 (July 12, 2019); *Form CRS Relationship Summary; Amendments to Form ADV*, Release No. 34-86032, 84 Fed. Reg. 33,492, 33,593 (July 12, 2019). The Commission therefore knows this kind of combined analysis is both possible and appropriate; it simply chose not to apply it here.

It is no answer for the Commission to say (as it did) that "[t]o the extent those proposals are adopted, the baseline in those subsequent rulemakings will reflect the regulatory landscape that is current at that time." Sec. Lend. R. at 75,695. The fact that the Commission's economic analysis was limited

to the exact minute the Securities Lending Rule was adopted (not the same day, week or month) underscores its inadequacy. Two rules may affect and overlap with each other in different ways, and strategically sequencing the analysis may impermissibly allow an agency to avoid having to analyze or justify certain costs. If one rule is relevant to another set to be promulgated the same day—or one that the agency knows or expects will be promulgated shortly—the agency must consider them together. No properly functioning agency could adopt a rule based on an analysis that the same agency plans to alter in the next breath.

Notably, the Commission *did* consider—albeit only to a limited extent— the effect of the Securities Lending Rule on the Short Sale Rule. *See, e.g.*, Short Sale R. at 75,156, 75,158–59, 75,171. The Commission looked only at "potential economic effects arising from any overlap between the compliance period," not the actual substance or effect of the Rules. *Id.* at 75,149; *see also id.* at 75,171. In other words, the Commission did not address whether the *combined* costs of the two rules acting in tandem were justified by the supposed benefits. Moreover, the fact that the adopting release for the Short Sale Rule analyzed the effect of the Securities Lending Rule, but not vice

versa, serves only to accentuate the arbitrary nature of these related rule-makings: The Commission plainly understood their overlap and impact on one another, yet intentionally drafted the adopting releases to align with a strategic sequencing that allowed the Commission to elide serious consideration of the costs and benefits of the combined Rules.

The law demands far more rigor from agencies. "[T]he Government should turn square corners in dealing with the people." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 860 (5th Cir. 2022) (quotation marks omitted). "No principle is more important when considering how the unelected administrators of the Fourth Branch of Government treat the American people." *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 362 (5th Cir. 2024). That is why this Court requires a "searching and careful" review of an agency's justifications for regulatory action. *All. For Hippocratic Med. v. FDA*, 78 F.4th 210, 245 (5th Cir. 2023). But if the Commission's approach to rulemaking is allowed, it would provide a template for agencies to sidestep their responsibilities under the Administrative Procedure Act, all on the basis of legal formalism that fails to account for economic reality. This Court should not sanction such an approach.

\* \* \*

The Rules impose compounding burdens and costs on the industry, while any transparency benefits from one Rule will be diluted by the disclosure requirements of the other. But the Commission never even tried to weigh those compounding effects, and therefore has not fulfilled its statutory obligation to consider the economic impact of the Rules on the market or industry participants. The Rules are therefore arbitrary and capricious, and promulgated in violation of the law, and should be vacated.

## II. The Commission's Analysis Of Benefits And Costs Was Unreasoned And Inconsistent

Even if the Commission could justify its refusal to consider the combined and coordinated effects of the two Rules, however, each rule is independently arbitrary and capricious because the Commission (a) overstated the benefits and (b) understated the costs, as evidenced by its inconsistent cost-benefit analysis of both Rules.

### A. The Commission Exaggerated The Supposed Benefits Of The Securities Lending Rule

The principal benefit the Commission posits would arise from the Securities Lending Rule is greater pricing transparency for securities lending transactions, which the Commission claims will "reduce information asym-

metries in the securities lending market and improve informational efficiency." Sec. Lend. R. at 75,706. This uncritical assertion that more information is better is without any reasoned basis.

The problem with the Commission's conclusory statement is that securities lending transactions can arise in a wide variety of contexts (not just short selling), and different types of securities lending transactions are affected by different market forces. "Lending fees can vary greatly depending on the nature, size and duration of the transaction, the demand to borrow the securities, and other factors." FSB Interim Report at 19. Lenders sometimes "tailor acceptable collateral to the borrower in question," *id.* at 21, and typically have "guidelines on which counterparties can borrow its securities, the type of collateral it accepts, and, in case of cash collateral, cash management policy," OFR Reference Guide at 32.

What this means is that an investor looking at the information made public under the Securities Lending Rule will see a variety of interest rates, collateral amounts, and other financial terms that may not be even remotely comparable to the lending transaction that investor is contemplating. AR.127:2 (AIMA Comment (Jan. 7, 2022)); AR.321:4, 9 (Citadel Comment (Apr. 4, 2022)). Any effort by the investor to rely on that data in negotiating

lending terms could result in inefficiencies in the bargaining process, because the investor may believe the data provides support for a stronger negotiating position on rates, while the lender—who is privy to the actual conditions of the securities loans it has reported—knows that the investor's data comes from transactions that are not comparable. Thus, disseminating anonymized data regarding the general terms of securities lending transactions is likely to confound, rather than enhance, borrowers' and lenders' understanding of the market rates and terms for comparable securities loans. AR.130:11 (SIFMA Comment Jan. 7 (2022)); AR.1981:4–7 (SIFMA Comment May 15, 2023)).

The Commission acknowledged in the adopting release that "the data provided [under the Securities Lending Rule] will not include information about all of the factors that are relevant to the pricing of securities loans," and that "two loans may appear to be similar based on the Rule 10c-1a data but may not have the same fees due to factors not recorded in the data." Sec. Lend. R. at 75,713. Nonetheless, the Commission opined that "compared to the baseline level of information available to market participants, the more granular, comprehensive, and accessible data provided by the final rule will

improve market participants' abilities to compare loans," and that investors understand "that the pricing of loans is determined by many factors." *Id.*

The problems with this reasoning are manifest. The Commission is proceeding under the erroneous and unsupported assumption that more information is invariably better for investors, regardless of context. But simply asserting that a rule will "enable investors to make more informed investment decisions," without actually analyzing the additional information and how the market will receive it, is not enough to carry the Commission's burden. *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 178 (D.C. Cir. 2010). All rules mandating additional disclosure have the hypothetical potential to reduce information asymmetries. But that does not on its own afford the Commission carte blanche to impose burdensome reporting requirements without adequate scrutiny, especially where the required disclosures could reveal the confidential trading strategies of investors with little or no corresponding benefit. Agency decisions must be both "reasonable" and "reasonably explained," *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023), but a bare assertion that transparency is good—without any critical examination of the actual value of such transparency—is not a reasonable explanation of the need for intrusive regulatory action.

The Commission dismissed concerns about the uselessness of the data on the ground that investors understand "that the pricing of loans is determined by many factors," and that borrowers could still use the information to create "an expected range of borrowing costs." Sec. Lend. R. at 75,713. But the fact that some investors may appreciate that the data is useless cannot plausibly weigh in favor of mandating its disclosure. *See Mexican Gulf Fishing*, 60 F.4th at 973 (agency action is arbitrary and capricious where the "insignificant benefits d[id] not bear a rational relationship to the serious financial and privacy costs imposed"). And the Commission failed to explain how an "expected range of borrowing costs" could be useful to securities borrowers if they do not know what the data points in that "expected range" represent.

At minimum, the Commission failed to consider whether investors or lenders would have a sufficient understanding of the data to make use of it. Numerous commenters warned the Commission that the disclosed data could be "confusing," AR.87:3 (HIS Markit Comment (Jan. 4, 2022)); AR.113:2, 7 (BlackRock Comment (Jan. 7, 2022)), or "misleading," AR.124:3–4 (Fidelity Comment (Jan. 7, 2022); AR.108:2 (American Securities Associa-

tion Comment (Jan. 7, 2022)), to investors, who may not know what is included in the reported datasets or how the Commission intends investors to use that data. When agencies undertake a cost-benefit analysis to justify a regulation, "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). And here, the Commission's assessment of benefits was premised on its erroneous belief that indiscriminately injecting more raw data into the marketplace will benefit investors.

In short, the Commission's *ipse dixit* that the market will benefit from additional information—even if that information lacks the detail necessary to make it useful for investors—is not reasoned decisionmaking.

## B. The Commission's Cost Analysis Is Inconsistent

Finally, the Commission ignored significant costs to short sellers arising from the Securities Lending Rule, even though it acknowledged and credited those same costs when analyzing the Short Sale Rule. The Commission agreed that the Securities Lending Rule "could potentially harm market quality by making it easier for other investors to discern short sellers' trading strategies, thereby discouraging the costly fundamental research that un-

derlies some short selling strategies." Sec. Lend. R. at 75,709. But the Commission concluded that "[o]n balance," the fact that the Securities Lending Rule "delays the dissemination of loan volume information by 20 business days" leads to the conclusion that the Rule "is not likely to significantly expand market participants' abilities to discern short selling strategies." *Id.*

But the Commission made different findings in the Short Sale Rule, promulgated the same day. There, the Commission observed that "[b]ecause short positions can take a long time to accumulate, even with a lag, the information motivating the trades being reported may not be stale." Short Sale R. at 75,163. It acknowledged also that disclosure of short positions could "increase[e] the likelihood that some of the information contained in the trades of large short sellers will be acted on by other market participants before the short seller could acquire their optimal position." *Id.* And the Commission recognized that in light of these possibilities, "[m]anagers who wish to build large short positions may choose to execute their transactions at a pace that is faster than what they would have done otherwise to attempt to profit from their research before information is disclosed and copycat investors are able to trade based on the reported data," which could "impose[]

increased transaction costs on [m]anagers" and "harm price efficiency." *Id.* at 75,164.

The Commission was made well aware of this inconsistency. Petitioner MFA pointed out during the comment phase that the Securities Lending Rule "purports to treat the public disclosure of loan-by-loan information as an unmitigated benefit to the short selling market, even though the Commission concluded the opposite in the [Short Sale Rule]." AR.316:3 (MFA Comment (Apr. 1, 2022)). Petitioner AIMA similarly pointed out that, despite going "to great lengths to highlight the negative impacts" of excess disclosure in the proposed Short Sale Rule, the Commission nonetheless "fail[ed] to contemplate or examine these concerns" in the proposed Securities Lending Rule. AR.313:3 (AIMA Comment (Apr. 1, 2022)). Nevertheless, the Commission failed to justify this differential treatment.

An agency may not rely on "inconsistent" reasoning to justify regulatory action. *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 934 (D.C. Cir. 2008). The maintenance of "two irreconcilable policies," allowing the agency to "circumvent" the limitations of one or the other, constitutes "arbitrary and capricious agency action." *Id.* at 935. At the very least, the Commission was required to acknowledge the tension between the justifications for the two

rules and explain why the concerns identified in the Short Sale Rule either do not arise or are mitigated in the Securities Lending Rule. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also State Farm Mut. Auto Ins.*, 463 U.S. at 51 (holding that agency was required to consider an alternative in light of past judgments regarding that alternative). But here, the Commission did neither—it recognized a problem, but then dismissed it on a ground that is decidedly inconsistent with the reasoning in a contemporaneously adopted rule. *See* Sec. Lend. R. at 75,709; *see also* AR.315:2–3 (SIFMA Comment (Apr. 1, 2022)).

In addition to making inconsistent findings in the Securities Lending Rule, the Commission also simply ignored some of the harms from over-disclosure that it recognized elsewhere. For example, in the Short Sale Rule, the Commission observed that even a delayed dissemination of information regarding short positions could "be conducive to revealing proprietary trading strategies." Short Sale R. at 75,164. But the harm posed by the Short Sale Rule was mitigated, in the Commission's view, by the fact that the data reported out under that Rule reflects netted short selling activity across multiple short sellers. *Id.* The Securities Lending Rule, however, does not allow for such netting and aggregation, and instead requires reporting on a

loan-by-loan basis that the Commission acknowledged could be used to deduce short trading strategies, Sec. Lend. R. at 75,705, yet the Commission did not acknowledge this critical difference.

Elsewhere in the Short Sale Rule, the Commission noted the increased "risk of retaliation by other market participants," including by "[a]n issuer's directors or shareholders," against known short sellers. Short Sale R. at 75,164. That kind of retaliation can take the form of "short squeezes, nuisance lawsuits, intimidation, and physical violence." *Id.*; *see also* Owen A. Lamont, *Go Down Fighting: Short Sellers vs. Firms*, 2 Rev. Asset Pricing Stud. 1 (2012).[2] But in the Securities Lending Rule, the Commission noted this harm only in a footnote after it was raised by a commenter, Sec. Lend. R. at 75,710 n.891, and then pointed only to the delayed dissemination of loan amount information as purportedly mitigating those harms, even though such delay has nothing to do with the issue of retaliation.

---

[2] A short squeeze occurs when the price of a security rises rapidly because many investors short the security, and then rush to exit their position by repurchasing the securities on the market. That rise in demand raises the price, which in turn raise demand further, creating a cycle and rapid rise of the share price. *See, e.g.*, U.S. Securities and Exchange Commission, Key Points About Regulation SHO, https://www.sec.gov/investor/pubs/regsho.htm.

These harms to short sellers have real consequences for the market. Over-disclosure of information about short selling can make short selling more costly and discourage the practice overall. *See* Short Sale R. at 75,163 & n.624 (citing Robert F. Stambaugh et al., *The Short of It: Investor Sentiment and Anomalies*, 104 J. Fin. Econ. 288 (2012), and Edward M. Miller, *Risk, Uncertainty, and Divergence of Opinion*, 32 J. Fin. 1151 (1977)). Discouraging short selling will harm the market by reducing the benefits that short selling provides—such as pricing accuracy and inefficiency. *See* Short Sale R. at 75,163; *see also supra* pp.9–10. Indeed, the Commission recognized the risks arising out of even monthly, aggregate reporting. *Id.* at 75,163–165; *see also id.* at 75,165 ("Because reporting information on Form SHO increases the costs of short selling, the adopted rules could have several negative effects on price efficiency"); Barbara Bliss et al., *Negative Activism*, 97 Wash. U. L. Rev. 1333, 1385 (2020) (describing the ways that over-regulation can disadvantage short selling and similar strategies, to the detriment of the market and market transparency).

By identifying and conceding these costs in the Short Position Rule, the Commission has effectively admitted that those costs comprise an "important aspect" of the problem required to be considered under the APA.

*Mexican Gulf Fishing*, 60 F.4th at 973 (quotation marks omitted). The Commission was therefore required to give those costs serious consideration. Instead, the Commission's perfunctory or dismissive treatment of those costs rendered the analysis arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review and vacate the Rules.

Respectfully submitted,

March 12, 2024

Kevin Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS
ASSOCIATION
1099 New York Avenue, NW
Washington, DC 20001
(312) 782-0600

*/s/ Mark A. Perry*
Mark A. Perry
   *Counsel of Record*
Robert Stern
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
Mark.Perry@weil.com

Mark I. Pinkert
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Ave.
Miami, FL 33176

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ Mark A. Perry

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
mark.perry@weil.com

March 12, 2024

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 6,017 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

/s/ Mark A. Perry
_____
Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
mark.perry@weil.com

March 12, 2024