No. 23-60626

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS;
MANAGED FUNDS ASSOCIATION;
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

On Petition for Review of Orders of the
Securities and Exchange Commission

---

## BRIEF OF RESPONDENT
## SECURITIES AND EXCHANGE COMMISSION

---

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

DOMINICK V. FREDA
*Assistant General Counsel*

EMILY T. PARISE
*Senior Appellate Counsel*

STEPHEN A. SILVERMAN
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.6150 (Silverman)
silvermanst@sec.gov

## CERTIFICATE OF INTERESTED PERSONS

*Nat'l Ass'n of Private Fund Managers v. SEC*, No. 23-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioners Alternative Investment Management Association Limited, Managed Funds Association, and National Association of Private Fund Managers.

   Counsel for petitioners Jeffrey B. Wall and Judson O. Littleton of Sullivan & Cromwell LLP.

2. Respondent Securities and Exchange Commission.

   Counsel for Respondent Megan Barbero, Michael A. Conley, Dominick V. Freda, Emily T. Parise, and Stephen A. Silverman.

3. *Amicus Curiae* Chamber of Commerce of the United States of America.

   Counsel for *Amicus Curiae* Roman Martinez, Peter E. Davis, and Peter A. Prindiville of Latham & Watkins LLP and Andrew R. Varcoe and Tyler S. Badgley of the U.S. Chamber Litigation Center.

4. *Amicus Curiae* Committee on Capital Markets Regulation.

   Counsel for *Amicus Curiae* C. Wallace DeWitt of A&O Shearman and Hal S. Scott of the Committee on Capital Markets Regulation.

5. *Amicus Curiae* Former SEC Chief Economists.

   Counsel for *Amicus Curiae* Jonathan Y. Ellis, Katherine Richardson, and Kathryn M. Barber of McGuireWoods LLP.

6.    *Amicus Curiae* Investor Choice Advocates Network and California Alternative Investments Association.

Counsel for *Amicus Curiae* Angela Laughlin Brown of Gray Reed & McGraw LLP.

7.    *Amicus Curiae* Securities Industry and Financial Markets Association.

Counsel for *Amicus Curiae* Mark A. Perry, Robert Stern, Joshua M. Wesneski, and Mark I. Pinkert of Weil, Gotshal & Manges LLP and Kevin Carroll of the Securities Industry and Financial Markets Association.


*/s/ Stephen A. Silverman*
Stephen A. Silverman
Attorney of Record for Respondent

## STATEMENT REGARDING ORAL ARGUMENT

The Securities and Exchange Commission is prepared to present oral argument if it would assist this Court in resolving the petition for review.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

INTRODUCTION ............................................................................1

COUNTERSTATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE..................................................................5

    A.    Greater transparency regarding securites lending and short sales will
enhance the securities markets ............................................................5

        1. The securities lending market is large and opaque............................5

        2. There is an absence of information on the short positions and short
activity of institutional investment managers...................................8

    B.    Congress directed the Commission to increase the availability of
information in both the securities lending and short sale markets......11

    C.    The Commission adopted rules to implement Congress's directives to
increase transparency in the securities lending market and the short
sale market....................................................................... 12

        1. The Securities Lending Rule increases market transparency by
requiring the reporting of material loan terms. ...............................14

        2. The Short Sale Rule increases transparency by requiring
institutional investment managers to report short sale data ...........17

STANDARD OF REVIEW ...................................................................20

SUMMARY OF ARGUMENT ........................................................... 20

ARGUMENT ................................................................... 24

I.    The Securities Lending and Short Sale rules are consistent, and the
      Commission considered all relevant information in adopting the rules ..... 24

      A.    The Commission reasonably explained its decision to require the
            collection and publication of securities lending and short sale data...25

            1. The Commission reasonably explained its approach to disclosure
               of securities lending data .................................................................25

            2. The Commission reasonably explained its approach to disclosure
               of short sale data .............................................................................30

      B.    The Commission properly considered the rules' economic impact....32

            1. The Commission's economic analyses addressed both rules'
               benefits and costs.............................................................................32

            2. The Commission's approach is consistent with prior practice.........40

II.   The Commission's adoption of each rule complied with the APA  ............ 43

      A.    The Commission's adoption of the Securities Lending Rule is
            authorized by the Exchange Act and satisfies the APA.................... 43

            1. The Commission reasonably fulfilled its statutory mandate to
               increase transparency in the securities lending market ..................43

            2. The final Securities Lending Rule is a logical outgrowth of the
               proposed rule ................................................................................ 47

      B.    The Commission's selection of reporting requirements in the Short
            Sale Rule satisfies the APA, and the rule applies only to short sale
            transactions in equity securities effected in the United States. .......... 49

            1. The Commission reasonably explained why it required Managers to
               report short sale information to the Commission via EDGAR .......50

            2. The Short Sale Rule does not apply to transactions in foreign
               securities effected outside the United States ................................. 53

v

CONCLUSION ..................................................................................................56

Certifications

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Basic Inc. v.* Levinson,
    485 U.S. 224 (1988) ........................................................ 24

*Board of Governors, FRS v. Dimension Fin. Corp.*,
    474 U.S. 361 (1986) ........................................................ 44

*Business Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011) ........................................ 38

*Chamber of Comm. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ............................. ......32, 38

*Digital Realty Trust, Inc. v. Somers*,
    583 U.S. 149 (2018) ........................................................ 44

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ............................................... 24, 43

*Gozlon-Peretz v. United States*,
    498 U.S. 395 (1991) ........................................................ 45

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021)........................................ 24, 40, 49

*Long Island Care at Home, Ltd. V. Coke*,
    551 U.S. 158 (2007) ........................................................ 47

*Nasdaq Stock Mkt. LLC v. SEC*,
    34 F.4th 1105 (D.C. Cir. 2022) ................................... 18, 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ..................................................... 20, 50

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ........................................ 39

*Sierra Club v. U.S. Dept' of Interior*,
    990 F.3d 898 (5th Cir. 2021) ............................................................ 20

*United States v. Gonzales*,
    520 U.S. 1 (1997) ............................................................................... 46

**Statutes and Regulations**

5 U.S.C. 706 ......................................................................................... 20

15 U.S.C. 78j .................................................................................. 11, 44

15 U.S.C. 78m ............................................................................. *passim*

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ......................................... 1

    Sec. 929X ................................................................................*passim*

    Sec. 984 ..................................................................................*passim*

17 C.F.R. 242.200 ...............................................................................8, 53

17 C.F.R. 240.10c-1a ..................................................................*passim*

17 C.F.R. 240.13f-2 ...............................................................17, 18, 50

17 C.F.R. 249.332 ...................................................................................18

*Form CRS Relationship Summary; Amendments to Form ADV*,
    84 Fed. Reg. 33,492 (July 12, 2019) ..................................................42

*Investment Company Reporting Modernization*,
    81 Fed. Reg. 81,870 (Nov. 18, 2016) .................................................40

*Pay Versus Performance Rule*
    87 Fed. Reg. 55,134 (Sept. 8, 2022) ..................................................41

*Regulation Best Interest: The Broker-Dealer Standard of Conduct*
    84 Fed. Reg. 33,318 (July 12, 2019) ..................................................42

*Regulation SHO*
    69 Fed. Reg. 48,008 (Aug. 6, 2004) ..................................................12

*Securities and Exchange Act Release Notice*
    Release No. 1548, 1938 WL 32911 (Jan. 24, 1938) ...........................12

*Security-Based Swap Data Repository Registration, Duties, and Core Principles*
    80 Fed. Reg. 14,438 (Mar. 19, 2015) ..............................................41

*Short Sales*
    69 Fed. Reg. 48,008 (Aug. 6, 2004) ..............................................53

## Other authorities

Annual Report on SEC website Modernization Pursuant to Section 3(d) of the 21st
Century Integrated Digital Experience Act (Dec. 2022),
    *available at* https://www.sec.gov/files/21st-century-idea-act-report-2022-
    12.pdf…………………………………………………………………… 52

Current Guidance on Economic Analysis in SEC Rulemaking (Mar. 16, 2012)
    *available at* https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_
    analy_secrulemaking.pdf……………………………………………………32

Electronic Filing and the EDGAR System: A Regulatory Overview,
    *available at* https://www.sec.gov/info/edgar/regoverview.htm ....................50

FINRA Notice 23-19 (Nov. 9, 2023) ......................................................14

*Short Sale Position and Transaction Reporting*, SEC Div. of Econ. & Risk
Analysis (June 5, 2014)..............................................................................46

**INTRODUCTION**

Securities lending occurs when securities are transferred temporarily from one party, a securities lender, to another, a securities borrower, for a fee. Market participants engage in securities lending for a variety of reasons; "short selling" is one of them. Short selling involves a sale of a security that the seller does not own or a sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller.

The securities lending market is large and opaque. Although trillions of dollars in securities are on loan at any given moment, there is no comprehensive and readily available source of data regarding securities lending transactions. The resulting information asymmetries between market participants lead to inefficient pricing for securities loans, which, in turn, limits liquidity and price discovery within the securities lending market.

There is likewise no comprehensive and readily available data that provides investors and regulators with accurate and timely information regarding short positions and activity of large short sellers such as institutional investment managers. The lack of such information impedes regulatory oversight of market behavior and significant market events.

Congress sought to address these concerns in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010)

(Dodd-Frank), enacting two provisions that require the Commission to adopt rules to increase the availability of information about securities lending and short sales. Pursuant to Dodd-Frank section 984, the Commission adopted *Reporting of Securities Loans*, Release No. 34-98747 (Oct. 13, 2023), 88 Fed. Reg. 75,644 (Nov. 3, 2023) (Sec. Lend. R.) (A.R.4)[1], which requires certain parties to securities loans (most often securities lenders) to report the material terms of securities lending transactions that will be anonymized and—with one critical exception—published soon thereafter.  And, as mandated by Dodd-Frank section 929X, the Commission adopted *Short Position and Short Activity Reporting by Institutional Investment Managers*, Release No. 34-98738 (Oct. 13, 2023), 88 Fed. Reg. 75,100 (Nov. 1, 2023) (Short Sale R.) (A.R.2044), which requires certain institutional investment managers to report short position and short activity data that will be aggregated and anonymized before delayed publication.  The rules apply to different market participants and require the collection and dissemination of different data; and they take distinct—but equally reasonable—approaches to achieving Congress's overarching goal of increasing transparency while accounting for the potential downside risks of publishing too much data too quickly.

---

[1] "A.R." refers to the administrative record.  Numbering is from the Certified List filed with this Court on January 23, 2024.

This petition for review, brought by member organizations of institutional investment managers, challenges both rules, principally arguing that the rules are inconsistent when analyzed in tandem.  But that argument rests on the false premise that the data publication requirements of the Short Sale Rule are tailored to avoid the risk of harm from premature information disclosure while the different requirements of the Securities Lending Rule are not.  In fact, *both* rules acknowledge and address this risk:  the Short Sale Rule does so by requiring the anonymized monthly reporting and aggregated public dissemination of all data; the Securities Lending Rule does so by requiring all disseminated data to be anonymized and the subset of that data that poses the greatest risk of revealing short sellers' strategies (loan size data) to be published only after a significant delay.  That petitioners would have preferred that the two rules address the downside risks to the short selling market in the same way does not justify ignoring the Commission's explanation for why it chose the path it did in the Securities Lending Rule.  Nor does it provide a basis for rejecting the Commission's reasonable choice.

Petitioners likewise ignore the Commission's thorough discussion of the rules' economic impacts, including that the Short Sale Rule accounted for the costs and benefits of the Securities Lending Rule by including the previously adopted rule in its economic baseline.  In both respects, the Commission reasonably

balanced competing concerns and complied with the Administrative Procedure Act.

Petitioners fare no better in their challenges to the individual rules. The Commission promulgated the Securities Lending Rule pursuant to Dodd-Frank section 984, the statute specifically authorizing the rule, and there is no basis for engrafting onto section 984 limitations from the distinct section of Dodd-Frank that authorizes the Short Sale Rule. The Commission also provided the notice and explanation required by the APA for each of its choices in the two rules. And the purported concern that the Short Sale Rule will have impermissible extraterritorial effect is baseless: the rule does not apply to short sale transactions effected outside the United States.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the Commission reasonably explained the bases for the regulatory approaches it adopted in the Securities Lending Rule and the Short Sale Rule and reasonably considered the rules' likely economic effects.

2. Whether the Securities Lending Rule is consistent with the statute authorizing its promulgation and the APA's notice requirements.

3. Whether the Commission (a) reasonably explained its choice to adopt the regime for reporting information required by the Short Sale Rule; and

(b) reasonably determined that the Short Sale Rule applies to short sale transactions subject to Regulation SHO effected in the United States.

## STATEMENT OF THE CASE

### A. Greater transparency regarding securities lending and short sales will enhance the securities markets.

#### 1. The securities lending market is large and opaque.

Securities lending occurs when "securities are transferred temporarily from one party, a securities lender, to another, a securities borrower, for a fee." Sec. Lend. R. 75,645. Securities loans are typically fully collateralized transactions where lenders, referred to as beneficial owners, earn income by reinvesting the collateral into other interest-bearing investments. *See id.* at 75,695. Lenders are typically institutional investors with large portfolios seeking increased investment returns for minimal risk. *Id.* at 75,645.

At any given time, trillions of dollars in securities are on loan in the United States. *Id.* at 75,645 nn. 4 & 6, 75,702. As a result, while fees earned from securities lending are small relative to long-term stock returns, they can be substantial in the aggregate. Short Sale R. 75,158, 75,165 & n.648. Despite the size and complexity of the securities lending market, it is "opaque," with "a general lack of comprehensive information on current market conditions." Sec. Lend. R. 75,644.

Investors borrow securities from brokers or dealers in the "Customer market"; these brokers or dealers either source the shares from their own inventory, or borrow the securities from a lending agent in the "Wholesale market." *Id.* at 75,645. Investors borrow securities in the Customer market for a variety of reasons. *Id.* at 75,696. In the equity market, short sellers most commonly borrow securities to short stock that they predict will decrease in value. *See id.* In addition, options market participants use securities loans to hedge underlying positions in other securities. *Id.* Securities loans can also be used to close out a "fail to deliver," which happens when one party to a transaction is unable to deliver at settlement the security they previously sold. *Id.* Some financial entities use securities loans, particularly of fixed income securities, to obtain the type of collateral they need for other contracts. *Id.*

The cost of borrowing a security depends on several factors, including the demand for the security, the length of the loan, and the nature of the collateral. *Id.* at 75,693. But determining the market price of a given loan is hindered by the absence of centralized information about all securities lending transactions. *Id.* at 75,648 n.86. Instead, multiple commercial vendors primarily focus on the Wholesale market and disperse information through a "give-to-get" arrangement whereby entities provide their own Wholesale lending data in exchange for access

6

to vendor data.  *Id.* at 75,693.  Petitioners do not challenge the rules' application to the Wholesale market.  Br. 8 n.2.

Commercial vendors survey asset managers to collect data regarding the Customer market.  Sec. Lend. R. 75,693, 75,697.  Because these Customer market survey datasets rely on voluntary data submissions, market participants can choose not to contribute certain data for business, strategic, or other reasons.  *Id.* at 75,694, 75,697-98.  The resulting datasets are incomplete and suffer from "self-selection" bias.  *Id.*  Moreover, vendors do not collect information in a standardized form, limiting the comparability of data received from different commercial sources.  *Id.* at 75,694.

The securities lending market is thus "characterized by information frictions" because "access to timely securities lending data is limited for some market participants."  *Id.* at 75,693-94.  "[A]t any point in time, there is incomplete information on market conditions and some market participants have better information than others on borrowing costs and transactions."  *Id.* at 75,693.  The presence of "asymmetric information," the Commission concluded, "likely means that the prices at which securities loans take place are not efficient[.]"  *Id.* at 75,699.  These inefficiencies impair "both liquidity ... and price discovery" in the securities lending market.  *Id.*

7

**2. There is an absence of information on the short positions and short activity of institutional investment managers.**

One reason that parties engage in securities lending is to facilitate the short selling of securities. Short Sale R. 75,151. A short sale is any sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. 17 C.F.R. § 242.200(a). The seller profits if the price of the security goes down. Short Sale R. 75,151. Short selling can benefit the market by providing market liquidity, *id.* at 75,100 n.3, and adding pricing efficiency, *id.* at 75,101 n.5.

Short selling can also be used for "potentially abusive" purposes. *Id.* at 75,101 n.14, 75,138, 75,153-54. For example, manipulators using illegal "short and distort" strategies will first short a stock and "then engage in a campaign to spread unverified bad news about the stock with the objective of panicking other investors into selling their stock in order to drive the price down." *Id.* at 75,159-60. And abusive "naked" short selling occurs when a seller "sell[s] short without having stock available for delivery [at settlement] and intentionally fail[s] to deliver stock within the standard settlement period." *Id.* at 75,101 n.14, 75,138.

Abusive trading aside, selling a security short (a "short position") is generally riskier than owning the security outright (known as holding a "long position" in the security). *Id.* at 75,151. While the holder of a long position can, at

8

worst, lose the entire investment, a short seller can lose more than the value of the original investment because stock prices can rise indefinitely. *Id.* In addition, margin requirements, which determine the amount of collateral expected to be maintained, are often costly for short selling. *See id.* A rising stock price—even a temporary spike—can trigger a margin call that the short seller cannot satisfy, forcing the short position to be closed at a significant loss to the short seller. *Id.* at 75,151, 75,161. As a result of the foregoing pressures, as well as instability from when "spillovers from events in one asset ... [impact] the market for another asset," large and concentrated short positions can increase systemic risk. *Id.* at 75,161, 75,177-78.

Currently available data does not disclose to the public or regulators the concentration and variability of large institutional investment managers' short positions in specific securities. *Id.* at 75,154. For example, some sources report aggregate short positions at the security level, while other sources provide granular short volume information, but do not provide information on particular short positions or how they change over time. *See id.*

Some market participants try to measure short sale positions using securities lending data, though it "only provide[s] a noisy proxy of short sentiment." *Id.* at 75,156. Most securities lending data concerns the Wholesale market, which is only tangentially related to the short sale market and is "not traceable to individual short

sellers." *Id*. Securities lending data from the Customer market available from existing commercial sources has "several limitations," including that it is based on voluntary contributions, lacks comprehensiveness, and is biased. *Id*. Thus, securities lending data serves "only as an imperfect measure of short sentiment." Short Sale R. 75,156.

No existing data identifies short positions of individual traders. *Id.* at 75,148. The short sale market thus currently "lack[s] information about levels of and the timing of changes in economic short positions for specific [institutional investment m]anagers in specific securities." *Id.* at 75,154. In the absence of information about individual traders and trader types, "it is not possible ... to separate trading volume associated with market makers, algorithmic traders, investment managers, or other[s]." *Id.* at 75,155. Nor does the available data reveal "whether short sentiment is broadly or narrowly held or held by persons with larger positions." *Id.* at 75,154. The data also lags and is missing changes in short positions in a security that occur in the absence of buying and selling that security. *Id.* at 75,155. Given these shortcomings, "[e]xisting data sources fail to accurately represent economic short positions of [institutional investment m]anagers." *Id.* at 75,148.

### B. Congress directed the Commission to increase the availability of information in both the securities lending and short sale markets.

Following the 2008 financial crisis, Congress passed Dodd-Frank to "promote the financial stability of the United States by improving accountability and transparency in the financial system." 124 Stat. 1376. The statute contains two separate provisions aimed at increasing transparency and available data in the securities lending and short sale markets.

Dodd-Frank section 984(b) directed the Commission to "promulgate rules that are designed to increase the transparency of information available to brokers, dealers, and investors, with respect to the loan or borrowing of securities." 124 Stat. 1933. Under existing rules, only registered investment companies must make disclosures regarding securities lending transactions, and they are not required to report the material terms of those transactions. Dodd-Frank section 984(a) authorized the Commission to require further disclosures "as necessary or appropriate in the public interest or for the protection of investors." Exchange Act § 10(c)(1); 15 U.S.C. 78j(c)(1).

In a separate provision of Dodd-Frank, Congress directed the Commission to increase transparency in the short sale market. The Commission has long had plenary authority to regulate short sales of securities under section 10(a) of the Exchange Act, which makes it "unlawful for any person, directly or indirectly, …

11

[t]o effect a short sale … in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. 78j(a)(1). The Commission has issued rules designed to curtail short selling abuses. *See, e.g.*, Exchange Act Release No. 1548, 1938 WL 32911, *1, 5 (Jan. 24, 1938) (restricting sale of already-declining securities); 69 Fed. Reg. 48,008 (Aug. 6, 2004) (Regulation SHO, implementing marking and trading rules and anti-fraud provisions). Dodd-Frank section 929X, which added Exchange Act section 13(f)(2), directed the Commission to "prescribe rules for providing for the public disclosure of the name of the issuer and the title, class, CUSIP [Committee on Uniform Securities Identification Procedures] number, aggregate amount of the number of short sales of each security, and any additional information determined by the Commission following the end of the reporting period. At a minimum, such public disclosure shall occur every month." 15 U.S.C. 78m(f)(2).

### C. The Commission adopted rules to implement Congress's directives to increase transparency in the securities lending market and the short sale market.

To address "the lack of transparency and statutory objective[] to increase transparency in securities lending transactions," the Commission proposed a securities lending rule on November 18, 2021. *Reporting on Securities Loans*, A.R.1, Release No. 34-93613 (Nov. 18, 2021), 86 Fed. Reg. 69,802, 69,803, 69,822 (Dec. 8, 2021) (Sec. Lend. Prop.). On February 25, 2022, the Commission

reopened the comment period for the proposed securities lending rule, seeking

feedback "on any potential effects" that the newly proposed short sale rule might

have on the securities lending rule. *Reopening of Comment Period for Reporting*

*of Securities Loans*, A.R.2, 87 Fed. Reg. 11659. The Commission received nearly

2,000 comments on the proposed securities lending rule, Dkt. 16 in 23-60626, at 2-

100 (5th Cir.) (Certified List), and Commission officials held over 50 meetings on

the rule, including six with petitioner Managed Funds Association (MFA) and

three with petitioner Alternative Investment Management Association (AIMA). *Id.*

at 100-05. The Commission adopted the final Securities Lending Rule on October

13, 2023. Sec. Lend. R. 75,644.

On February 25, 2022, in response to "heightened attention to the difference

in long and short position reporting requirements, and, more generally, the lack of

transparency into the circumstances surrounding short sale transactions," the

Commission proposed a short sale rule requiring certain institutional investment

managers "to report, on a monthly basis … specified short position data and short

activity data" for publication. *Short Position and Short Activity Reporting by*

*Institutional Investment Managers*, A.R.2042, Release No. 34-94313 (Fed. 25,

2022), 87 Fed. Reg. 14,950, 14,952 (March 16, 2022) (Short Sale Prop.). The

Commission received more than 1,100 unique comments. *See id.* at 14,950;

Certified List at 106-61. Commission officials held seven meetings with petitioner

MFA and three with petitioner AIMA.  Certified List 161-63.  The Commission

adopted the final Short Sale Rule on October 13, 2023, after first adopting the

Securities Lending Rule.  Short Sale R. 75,100.

## 1. The Securities Lending Rule increases market transparency by requiring the reporting of material loan terms.

The Securities Lending Rule requires certain parties to securities loans to

report various information about any covered securities loan "to a registered

national securities association" at the end of each day on which a loan (or

modification thereof) is entered into.  17 C.F.R. 240.10c-1a, 1a(c), 1a(d), 1a(j)(2).

FINRA is currently the only registered national securities association.  FINRA

Notice 23-19, 2 n.1 (Nov. 9, 2023).  FINRA must anonymize the loan information

it receives pursuant to the rule and publish that information on the next business

day, with the exception of loan size information, which is published after 20

business days.  17 C.F.R. 240.10c-1a(g).  The next-business-day information

includes transaction-by-transaction data with respect to the specific "data

elements" listed in 17 C.F.R. 240.10c-1a(c)(1)-(5) and (7)-(12), the distribution of

loan rates for each reportable security, and aggregate transaction activity data

pertaining to the absolute value of transactions, Sec. Lend. R. 75,678 & n.506.  The

rule also requires the provision of certain confidential transaction data that is used only for regulatory purposes and is not made public.  17 C.F.R. 240.10c-1a(e).

In adopting the Securities Lending Rule, the Commission explained that next day publication enhances the price discovery and price efficiency benefits of collecting loan data.  *See* Sec. Lend. R. 75,726.  For example, next day publication reduces securities lenders' "information disadvantage with respect to their lending programs."  *See id.* at 75,707.  "By allowing beneficial owners to more easily benchmark their lending programs through access to data on loan prices ... , the final rule will provide beneficial owners with an improved ability to determine the quality of the loans that their lending program executes."  *Id.*  Next day publication is also "similar to the timeliness of much of the data provided by the commercial data providers."  *Id.* at 75,711, 75,704.  The Commission found that publishing information on a longer timeline would "delay market participants' abilities to benefit from Rule 10c-1a data."  *Id.* at 75,726.

But loan size data is not subject to next day publication.  Responding to commenters' concerns that publishing certain securities loan information might reveal short sellers' trading strategies, *see, e.g.*, *id.* at 75,665, 75,709, the Securities Lending Rule requires FINRA to delay publication of loan size data until 20 business days after the loan is effected (or is modified), 17 C.F.R. 240.10c-1a(g).  "[L]oan size information ... is the portion of the data most directly related to short

selling activity" due to the "close correlation" between customer loan size information and short interest.  Sec. Lend. R. 75,710-11, 75,696.  Delaying the release of loan size data by 20 business days makes such information less timely than data already available from commercial data providers and FINRA, thus "significantly reduc[ing] [its] novelty."  *Id.* at 75,665; *see id.* at 75,710-11, 75,727. Delaying the release of loan size information makes it more difficult for market participants to discern short sellers' trading strategies, *see id.* at 75,710-11, thus reducing the risk of "discouraging the costly fundamental research that underlies some short selling strategies," *id.* at 75,709.  Even with loan size information, market participants' ability to discern short selling strategies is limited by factors such as the ability of borrowers to split loans across multiple prime brokers, confidential information, and securities loans effected for purposes unrelated to short sales.  *See id.*; *see also id.* at 75,711 n.900.

The Commission was "not aware of any commercially available securities lending dataset that currently provides securities lending data as comprehensive, accessible, and informative about all segments of the securities lending market (*i.e.*, both the Wholesale market and Customer market), as the data provided by the final rule."  Sec. Lend. R. at 75,694.  The rule thus "reduce[s] information asymmetries ... leading to a more efficient securities lending market." *Id.* at 75,706.  More efficient securities lending markets, in turn, lower borrowing costs

for investors, particularly for securities in high demand, by allowing them to obtain better loan terms. *Id.* at 75,707-08. Because the cost of borrowing a security is directly related to the cost of short selling, the Securities Lending Rule ultimately decreases the cost of short selling for investors. *Id.* at 75,709-10.

### 2. The Short Sale Rule increases transparency by requiring institutional investment managers to report short sale data.

Unlike the Securities Lending Rule's reporting requirements, which apply to certain parties to securities loans (in most cases securities lenders), the Short Sale Rule imposes reporting requirements on "institutional investment managers" (Managers) as that term is defined in Exchange Act section 13(f)(6)(A),[2] and "enhance[s] transparency" in the short sale market. Short Sale R. 75,105-06. The Short Sale Rule requires Managers to file, within 14 days after the end of each calendar month, a new Form SHO with the Commission setting forth certain short position and activity data if certain quantitative thresholds are met. 17 C.F.R. 240.13f-2, 13f-2(a)(1)-(3). Filings are made via the Commission's Electronic Data Gathering, Analysis, and Retrieval system (EDGAR). 17 C.F.R. 240.13f-2(a)(3). The data reported to the Commission includes daily changes to short positions and

---

[2] An "institutional investment manager" is "any person, other than a natural person, investing in or buying and selling securities for its own account, and any person exercising investment discretion with respect to the account of any other person." 15 U.S.C. 78m(f)(6).

the Manager's end-of-month gross short position, *see* 17 C.F.R. 249.332

(Appendix A), which the Commission will anonymize, aggregate by security

across Managers, and publish by the end of the month, Short Sale R. 75,119; 17

C.F.R. 240.13f-2(a)(3).[3]

Like the Securities Lending Rule, the Short Sale Rule "balance[s] competing

interests of public transparency against the potential negative impacts" of faster

and more robust data disclosure.  Short Sale R. 75,132-33.  Thus, for example, the

Commission opted against "[n]arrowing the scope" of equity securities covered by

the rule, *id.* at 75,108, and lengthening the time for providing and publishing data,

*id.* at 75,119.  On the other hand, the Commission required maintaining the

confidentiality of information that would reveal the Managers' identities, *id.* at

75,128-29, required that Managers provide data only monthly, *id.* at 75,118-19,

and will publish only aggregated data, *id.* at 75,132-33.  The Commission also

modified the proposed rule in a way that is "likely to reduce reporting costs to

Managers" by revising a key reporting threshold in a manner likely to reduce the

---

[3] The Short Sale Rule also amended the consolidated audit trail (CAT) national
market system (NMS) Plan to require the reporting of whether an order to sell an
equity security is a short sale effected by a firm engaged in bona fide market
making.  Short Sale R. 75,135-39; *see* CAT NMS Plan §6.4(d)(ii)(E).  Petitioners
do not challenge this aspect of the Short Sale Rule, which should be severed and
"given effect" if other aspects of the rule were "held to be invalid," Short Sale R.
75,185, since it "can function sensibly without the stricken provision[s]."  *Nasdaq
Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1144 (D.C. Cir. 2022) (cleaned up).

number of reporting entities; streamlining reporting requirements; reducing the granularity of data to be provided with regard to short activity information; not adopting new "buy to cover" CAT reporting requirements; and not adopting a proposed rule requiring "buy to cover" order marking in certain circumstances. *Id.* at 75,147, 75,172 n.708.

The Short Sale Rule's economic analysis expressly included the Securities Lending Rule in its economic baseline because, the Commission explained, "existing regulatory requirements, including recently adopted rules [are] part of [the] economic baseline against which the costs and benefits of the final rule are measured." *Id.* at 75,149; *id.* at 75,148-49, 75,156. The Commission found that information collected by the two rules "enhance[s] the usefulness" of each other, *id.* at 75,158, and the short sale data is "additive" to existing data, *id.* at 75,147, 75,159. The Commission found that the combined data would be useful for "detecting activities such as naked short selling or other potential violations," *id.* at 75,158, and assessing the concentration of securities lending activity, *id.* at 75,162. The rules, moreover, disclose different data, resulting in distinct benefits to market participants and that will "help foster fair and orderly markets." *See id.* at 75,146.

In its economic analysis, the Commission found that the Short Sale Rule "balance[s] the costs of adoption against the benefit to transparency that will be provided to regulators and the public." *Id.* at 75,147. Those benefits include

19

"clos[ing] informational gaps in the currently available data" and "improv[ing]

regulatory oversight," which will "discourage market manipulation," *id.* at 75,146-

47, and enable the Commission to assess systemic risk and reconstruct unusual or

significant market events, *see, e.g.*, *id.* at 75,127, 75,140, 75,158.  The Commission

concluded that this additional transparency "will enhance the Commission's ability

to protect investors" and "help ensure the sufficiency of information related to

short selling in the market," *id.* at 75,158; *id.* at 75,156.

## STANDARD OF REVIEW

Under the APA, a rule may be set aside only if the Commission exceeded its

statutory authority or the rule is arbitrary and capricious.  5 U.S.C. 706(2)(A), (C).

The Commission must "articulate a satisfactory explanation for its action," *Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43

(1983), and this Court may not "substitute its judgment for that of the agency" but

rather must "consider[] whether the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment," *Sierra Club

v. U.S. Dep't of Interior*, 990 F.3d 898, 904 (5th Cir. 2021) (cleaned up).

## SUMMARY OF ARGUMENT

The Commission adopted two separate rules pursuant to two separate

congressional grants of authority.  Both rules are aimed at increasing transparency

and information, and both are well-reasoned exercises of the Commission's

discretion.  The Securities Lending Rule will, for the first time, provide market participants with access to comprehensive and centrally located information regarding the material terms of transactions in the trillion-dollar securities lending market, resulting in reduced market information asymmetries, lower borrowing costs, and more informed investment decisions.  The Short Sale Rule will require disclosure of data to market participants regarding the aggregate gross short position and short activity data of Managers and provide regulators with more timely data that they can use to monitor short positions that increase systemic risks.  The rules are independent yet complementary, and each satisfies Congress's goal of increasing available data in their respective markets.

**I.**  The Commission reasonably adopted disclosure regimes for securities loans and for short sales that reflect the benefits and risks of publicly disclosing distinct (albeit related) datasets, and each is designed to minimize the risk of chilling the short sale market.  The Securities Lending Rule requires the collection and publication of the material terms of securities loan transactions, by security, on both an aggregated and transaction-by-transaction basis, anonymized to prevent the disclosure of potential short sellers' identities.  Securities loan data that is less likely to risk revealing proprietary short sale strategies is published within one business day of receipt.  But the release of loan size data—the metric that poses the greatest risk of disclosing short sale strategies—is delayed by 20 business days,

substantially reducing potential risks to the short sale market. Correspondingly, the Short Sale Rule requires the public disclosure of certain daily short activity data and end of month gross short position data, but does so on an anonymized, aggregate, and monthly basis to mitigate the risk of revealing certain proprietary short sale trading strategies. In short, both rules address the risk of harm to the short sale market from premature disclosure of data, but each does so in a way that is reasonably tailored to the nature of its respective market; the rules take different approaches that are complementary, not contradictory.

The Commission also sufficiently considered the rules' economic impacts. Although the rules function independently and were voted on separately, the Commission expressly included the rule it adopted first (the Securities Lending Rule) in the baseline of the economic analysis of the rule it adopted second (the Short Sale Rule)—a reasonable approach that leaves no gaps in the economic analysis and avoids any possible double-counting. There is no legal basis for petitioners' insistence that these separately voted rules must *each* address the economic impact of the other in their respective adopting releases. And petitioners do not explain in practical terms how their standard would work.

**II.** The Commission complied with the APA in adopting both rules and Petitioners' individual challenges to each rule are thus meritless. Their argument that the Securities Lending Rule is contrary to limitations on disclosure in Dodd-

22

Frank section 929X is doubly flawed.  Section 929X authorizes the Commission to adopt rules relating to short sales and says nothing about securities loans; the Securities Lending Rule is expressly authorized by Dodd-Frank section 984, which does not contain the purported disclosure limitations.  In any event, there is no conflict because section 929X sets a floor, not a ceiling, on short-sale-information disclosure.  And although petitioners claim that they were not given a meaningful opportunity to comment on the Securities Lending Rule's 20-business-day delay for loan size disclosure, the Commission asked for comment on the disclosure timelines—which petitioner AIMA responded to—and the 20-business-day delay directly addresses commenters' (including petitioners') concerns regarding risks to the short sale market.

As for the Short Sale Rule, petitioners incorrectly claim that the Commission did not explain why it chose EDGAR reporting instead of FINRA reporting.  The Commission explained that using FINRA reporting in this circumstance would limit the data collected in several respects.  And petitioners' suggestion that the Commission intends to apply the Short Sale Rule to short sales of foreign securities traded on foreign exchanges is baseless:  the rule applies only to Managers that effect U.S. short sale transactions in equity securities subject to Regulation SHO, and thus is limited to domestic transactions.

23

## ARGUMENT

The "'fundamental purpose' of the [Exchange] Act [is] implementing a 'philosophy of full disclosure.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). Congress directed the Commission in separate statutory mandates to increase the information available in the securities lending and the short sale markets.  With respect to the securities lending market, Dodd-Frank requires the Commission to issue rules "designed to increase the transparency of information available to brokers, dealers, and investors [in] the loan or borrowing of securities."  124 Stat. 1933.  Regarding the short sale market, the statute directs the Commission to "prescribe rules providing for the public disclosure" of additional information regarding "short sales of ... securit[ies]."  15 U.S.C. 78m(f)(2).  The Securities Lending Rule and the Short Sale Rule are designed to fulfill those statutory mandates, and the Commission complied with the APA in adopting both.

I. **The Securities Lending and Short Sale rules are consistent, and the Commission considered all relevant information in adopting the rules.**

The Commission "reasonably considered the relevant issues and reasonably explained [its] decision[s]."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  That is "all the APA requires."  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021).

24

**A. The Commission reasonably explained its decision to require the collection and publication of securities lending and short sale data.**

**1. The Commission reasonably explained its approach to disclosure of securities lending data.**

The Securities Lending Rule requires certain parties to securities loans to report the material terms of their securities lending transactions to FINRA, which—with one significant exception—will publish such information on both a transaction-by-transaction and aggregated basis, in an anonymized form, soon thereafter. That one exception is key to the Commission's approach here—it delays the required dissemination of loan size information by 20 business days to minimize the risk of FINRA publishing data that, if immediately available, would pose the greatest risk of revealing proprietary short sale information. By increasing transparency in the securities lending market but delaying by 20 business days the disclosure of loan size information, the Commission balanced the benefits of increased transparency in the securities lending market against the risk of chilling short selling activity. *Id.* at 75,684, 75,710-11, 75,725-26.

Petitioners' erroneous claim (Br. 31-32) that the Commission failed to heed calls "to harmonize the two proposals" rests on the false premise that, in the Securities Lending Rule, the Commission did not account for the risk of chilling

short sale activity.  Petitioners simply ignore the Commission's acknowledgement of that risk and its explanation of the approach it was taking to address it.

The Commission reasonably determined that most loan-level securities lending data can be provided to participants in the securities lending market with only a one-business-day delay, 17 C.F.R. 240.10c-1a(g)(1), because it is less likely to "increase the risk of revealing short sale strategies," Sec. Lend. R. 75,684, or cause "harm to short sellers," *id.* at 75,710-11; *id.* at 75,690.  In response to commenters' concerns "that the disclosure of reported information by [FINRA] on a transaction-by-transaction basis could increase the risk of revealing short sale strategies," the Commission specified that requiring next-day publication of "aggregate transaction activity and distribution of loan rates for each reportable security" would reveal "information pertaining to the absolute value of transactions such that net position changes should not be discernable in the data, and is intended to help ensure that only aggregate information …, rather than individualized information, is provided to the public."  *Id.* at 75,684; *see also id.* at 75, 678 n.506 (addition of term aggregate transaction activity "limits the possibility of publishing proprietary information while still providing volume transparency to market participants").

By contrast, loan size information is, as the Commission acknowledged, "the portion of the data most directly related to short selling activity."  *Id.* at 75,710-11.

26

In the Customer market, securities loans are between an individual end borrower and their broker-dealer. *Id.* at 75,655. If a securities loan is made to facilitate a short sale, the size of a Customer market loan when first created is the same as the size of a short position at the end of the day it was created. *See id.* at 75,705. Therefore, revealing the size of an individual loan in real-time could reveal the size of individual short positions at that time.

That is why the Commission adopted a different disclosure timeline for loan size data—delaying the publication of transaction-by-transaction loan size data by 20 business days, *see* 17 C.F.R. 240.10c-1a(g)(2), which "reduce[s] the potential to anticipate and reverse engineer the trading of competitors," Sec. Lend. R. 75,660, and minimizes the risk that disclosure would "signal" to the market "that a short position is being established," *id.* at 75,665 (citation omitted).

Petitioners refer (Br. 37-38) to the Commission's acknowledgement that even delayed loan-size data could provide some modicum of novel information about short sellers' strategies but omit the Commission's finding that "it is not clear that such an analysis, which would be inherently noisy, would provide actionable insights into future short selling activity that could harm short sellers' abilities to profit from negative information." Sec. Lend. R. 75,711. Delayed disclosure, the Commission explained, "significantly reduce[s] the novelty of the information disseminated ... such that it is less timely than pre-existing sources of

27

short selling transparency," *id.* at 75,665, and thus "address[es] the potential

negative consequences of ... 'linking' ... securities loan information to short sale

information," *id.* at 75,690; *see also id.* at 75,710.

This careful tailoring is reflected elsewhere in the rule. For example, the

rule requires lenders to report loan modifications, meaning that an increase or

decrease in the size of a securities loan must be reported. *See* 17 C.F.R. 240.10c-

1a(d). Because that information might reveal the new size of a short position, the

Commission determined that its publication should also be delayed 20 business

days. 17 C.F.R. 240.10c-1a(g)(3)(ii). In addition, because most securities loans

are fully collateralized, revealing the amount of collateral would be tantamount to

revealing the loan size. The rule avoids this problem by requiring the reporting of

four types of data related to loan collateral, 17 C.F.R. 240.10c-1a(c)(7)-(10), but

not the *amount* of collateral. Similarly, the Commission rejected commenters'

requests to limit the rule to the Wholesale market because, it found, such an

approach would significantly reduce the benefits stemming from increased

transparency into the securities lending market; in particular, "the effects of the

rule on competition between broker dealers, which would be expected to … reduce

costs for short sellers, would not materialize." Sec. Lend. R. 75,665, *id*. at 75,726.

In addition, the Commission found that the risk of revealing short sellers'

strategies is further mitigated if, as is not uncommon, short sellers borrow

securities from multiple prime brokers.  *See id.* at 75,711 & n.900; *see also* Short

Sale R. at 75,162 & n.617.  For example, suppose a hedge fund manager borrows

shares of a particular stock from five different prime brokers, with sizes 10,000,

20,000, 30,000, 40,000, and 50,000 shares, respectively.  Under the Securities

Lending Rule, there would be five separate, anonymous securities lending

transactions, making it difficult for market participants to infer that these five

transactions were entered into by the same hedge fund manager.  While the prices

of these securities lending transactions would be disseminated on a next-day basis

for price transparency, the sizes would not be disseminated until 20 business days

later.

Given the anonymous nature of transaction reporting, the Commission

reasonably concluded, it would be difficult for market observers to ascertain

whether multiple securities loan transactions are made by the same short seller.

*See id.*  As a result, from the perspective of market observers, no securities loan

transaction would accurately reflect an actual short selling strategy.  Even in the

Customer market, securities loans can be used for purposes other than to facilitate

short sales, *see supra* p. 16, further diminishing the ability of market participants to

glean information into individual, directional short strategies.

Petitioners grapple with none of this.  Rather, they attempt (Br. 35-36) to

blur the distinctions between the Securities Lending and Short Sale Rules by

claiming that the rules reached "contradictory conclusions" about the cost impact of "publicly disclosing short-sale information." Only the Short Sale Rule directly governs the disclosure of "short-sale information." The Securities Lending Rule requires certain parties to securities loans to disclose specified securities loan information, which will reduce the borrowing costs of making a short sale, in addition to serving other purposes unrelated to short selling. As the Commission concluded, making this information more readily available in the securities lending market will increase that market's efficiencies and lower borrowing costs. Sec. Lend. R. 75,706-08; *see* Am. Br. of Comm. on Cap. Mkts. Reg., at 9 ("All stock market investors benefit from improved price efficiency."). Decreasing borrowing costs will, in turn, decrease short selling costs. Sec. Lend. R. 75,709-10. For this reason, the Commission found that the "net result will be positive" even when considering other aspects of the Securities Lending Rule that may increase short selling costs. *Id.* at 75,709.

### 2. The Commission reasonably explained its approach to the disclosure of short sale data.

In adopting the Short Sale Rule, the Commission likewise sought "to balance calls ... to enhance the transparency of short-sale related data, with, ... concerns raised ... regarding potential 'chilling effect[s]' on short selling." *Id.* at 75,131. The Commission determined that "publication of aggregated short

30

position data, on a delayed basis, is a reasonable means of minimizing the potential

negative impacts of short position and short activity disclosures on short selling."

*Id.* at 75,126.

The Short Sale Rule considered the same concerns as in the Securities

Lending rule and addressed them in a different, but equally reasonable, manner

tailored to the particular features of the short sale market.  First, the rule delays the

frequency of Manager reporting to 14 days after the end of each reporting month

and therefore the frequency of publication by the Commission.  *Id.* at 75,119.  The

overall delay between the end of the reporting month and the Commission's

publication of the anonymized and aggregated data will be approximately one

month.  *Id* at 75,158.  The Commission reasoned that a shorter timeline might

"increase the risk of short squeezes or other manipulative activities that could

interfere with the price discovery function of equity markets," and that a longer

timeline "is unnecessary" because monthly reporting is less often than FINRA

already requires.  *Id.* at 75,119.  Second, the rule requires publication of only

aggregated data to minimize the "risk of retaliation [against Managers], copycat

trading and other market activity that might have an undesired chilling effect on

price discovery."  *Id.* at 75,132-33.

**B. The Commission properly considered the rules' economic
impact.**

The Commission satisfied its role to "determine as best it can the economic

implications" of the rules, *Chamber of Comm. v. SEC*, 412 F.3d 133, 143 (D.C.

Cir. 2005), when it reasonably explained the lack of available data in the respective

markets, Short Sale R. 75,146-48; Sec. Lend. R. 75,692-94, weighed the costs and

benefits of each rule, Short Sale R. 75,158-73, Sec. Lend. R. 75,706-723, and

considered the rules' effects on efficiency, competition, and capital formation.

Short Sale R. 75,173-74, Sec. Lend. R. 75,723-24.

**1. The Commission's economic analyses addressed both
rules' benefits and costs.**

As the Commission explained in adopting the Securities Lending Rule,

"consistent with its long-standing practice, the Commission's economic analysis in

each adopting release considers the incremental benefits and costs for the specific

rule—that is, the benefits and costs stemming from that rule compared to the

baseline." Sec. Lend. R. 75,723-24. The point of the economic analysis is to

ascertain a rule's likely economic consequences by assessing the effect that a rule's

adoption will have on the world as it exists without the new rule. "'The economic

consequences of proposed rules (potential costs and benefits including effects on

efficiency, competition, and capital formation) should be measured against a

baseline, which is the best assessment of how the world would look in the absence

32

of the proposed action.'" *Id.* at 75,694 n.724 (quoting Staff's "Current Guidance on Economic Analysis in SEC Rulemaking" (Mar. 16, 2012)).[4] And "[t]he economic analysis appropriately considers existing regulatory requirements, including recently adopted rules," the Commission explained, "as part of its economic baseline against which the costs and benefits of the final rule are measured." *Id.* at 75,694.

The Commission further explained that, consistent with its long-standing practice, the Securities Lending Rule's baseline for its economic analysis included any recently adopted rules. *Id.* at 75,694-95. But those rules that "remain at the proposal stage," like the later-adopted Short Sale Rule, would *not* be included in the Securities Lending Rule's economic baseline. *Id.* at 75,695. As the Commission reasoned, "[t]he best assessment of how the world would look in the absence of the proposed or final action typically does not include recently proposed actions, because that would improperly assume the adoption of those proposed actions." *Id.* at 75,694 n.724. Rather, if and when adopted, "the baseline in those subsequent rulemakings," including the Short Sale Rule, "will reflect the regulatory landscape that is current at that time." *Id.* at 75,695. And that is what the Commission did: it included the first-adopted Securities Lending Rule in the

---

[4] *Available at* https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf.

baseline of the later-adopted Short Sale Rule.  Short Sale R. at 75,148-49, 75,155-56.

This means that the Commission's analysis of the Short Sale Rule accounts for the Securities Lending Rule's benefits of "increase[d] transparency in the securities lending market through improvements to the comprehensiveness, breadth, accuracy, and accessibility of securities lending data."  Sec. Lending R. 75706.  The resulting "reduced information asymmetries" and "more efficient securities lending market," the Commission explained, will lead to decreased borrowing costs in the securities lending market overall, but, more to the point, it would independently decrease short selling costs for investors.  *Id.* at 75,706-10. As the Commission found, the Securities Lending Rule provides loan information that is complete, centrally located, and free, Sec. Lend. R. 75,706–07; will enable beneficial owners to benchmark their lending programs and determine their loan quality, *id.* at 75,707; and, as the Short Sale Rule itself recognizes (Short Sale R. at 75,156), inform the public (on a 20-business-day delay) about the amount, distribution, and direction of short sentiment, Sec. Lend. R. 75,707.  The Commission determined that these economic impacts will likely increase efficiency in the securities lending market, increase competition in certain segments of the industry while reducing it in others, and "will have mostly positive effects on capital formation."  *Id.* at 75,723-24.

Although the Commission acknowledged that the Securities Lending Rule would "produce countervailing effects through its impact on short selling," it found that "ultimately … the net result will be positive." *Id.* at 75,709. "On one hand," the Commission explained, "the final rule will benefit short sellers by lower borrowing costs," while, "[o]n the other hand, the final rule could potentially harm market quality by making it easier for other investors to discern short sellers' trading strategies[.]" *Id.* "On balance," the Commission concluded, because the final rule delays the publication of loan-size data, it was "not likely to significantly expand market participants' abilities to discern short selling strategies." *Id.*

The Short Sale Rule, in turn, "more clearly" informs the public about the timing, concentration, and aggregate gross short positions of Managers in the recent past. Short Sale R. 75,161-62. Data from each of the rules, the Commission concluded, "help[s] foster fair and orderly markets." *See id.* at 75,146. Indeed, the Commission found that the information collected by each rule "enhance[s] the usefulness" of the other. Short Sale R. 75,158. For example, "the Commission may use [the combined] data in an attempt to match securities lending with actual short positions taken," which "can be useful for market reconstructions [and] detecting activities such as naked short selling or other potential violations." *Id.*; *see also id.* at 75,148-49. In addition, the combined data can be used "to assess the degree to which securities lending is widely dispersed among market participants

35

or concentrated." *Id.* at 75,162.  And Short Sale Rule data for open positions "could be combined with FINRA short interest and [Securities Lending Rule] data to estimate the proportion of short positions held by large short sellers." *Id.*  The rules therefore require dissemination of different data that is "additive" and beneficial to each market.  *Id.* at 75,159.  These are the incremental economic benefits of the Short Sale Rule over an economic baseline that includes the Securities Lending Rule.

In addition, while the Commission reasonably concluded that "a more efficient securities lending market" will lead to decreased borrowing costs for short sellers, Sec. Lend. R. at 75,706-10, the Commission acknowledged that, to the extent the Short Sale Rule's adoption causes a decrease in short selling, there might be less activity in the securities lending market and lower returns for securities lenders.  Short Sale R. at 75,166.  "[C]ognizant of these costs," the Commission explained, it structured the Short Sale Rule "to reduce the burdens incurred by market participants without sacrificing the transparency that is expected to result[.]" *Id.* at 75,147.

Petitioners pretend that none of the above analysis occurred when they assert (Br. 40-41) that the Commission failed to account for the economic impact of both rules.  But including the Securities Lending Rule in the economic baseline against which the Commission analyzed the economic impacts of the Short Sale Rule left

36

no gap in considering the rules' benefits and costs, and avoids the problem of double-counting. The Short Sale Rule references the Securities Lending Rule throughout the economic analysis, including in the introduction, *id.* at 75,148, the baseline, *id.* at 75,155-56, and the discussions of the rule's economic effects on investor protection and market manipulation, *id.* at 75,158, and price efficiency, *id.* at 75,162. The Short Sale Rule also thoroughly compares both rules' requirements, *id.* at 75,156, 75,161-62, belying petitioners' assertion (Br. 31) that the Commission "did not mention the other rule's requirements, much less consider how those rules' requirements compared to each other."

Petitioners thus pull words out of context in asserting (Br. 40, 43-44) that the Short Sale Rule only considered the impacts of overlapping "compliance periods." As explained above, in adopting the Securities Lending Rule, the Commission thoroughly considered the costs and benefits to the short sale market and tailored the Securities Lending Rule to minimize any risk of chilling short sale activity. Because these economic impacts are baked into the baseline of the Short Sale Rule, the analysis of the likely economic consequences of the Short Sale Rule considers the economic impact of both rules. The Commission then separately and additionally considered whether the rules' overlapping compliance periods might result in higher compliance costs than if those compliance periods were not

overlapping and found that those increased costs would not be "significant." *Id.* at 75,171.

The Commission is not required to consider the economic impacts of each rule throughout *both* rule releases in order to satisfy its statutory obligation to reasonably "determine as best it can the economic implications" of the rules it adopts, *Chamber of Comm.*, 412 F.3d at 143, and petitioners cite to no case that holds otherwise.  Petitioners point to *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011), for the proposition that the Commission's "failure to 'apprise itself ... of the economic consequences of a proposed regulation' makes promulgation of the rule arbitrary and capricious."  But there the court was simply referring to the "proposed" version of the rule under review—not the proposed version of an altogether separate rule.  Nothing in *Business Roundtable* suggests that it is arbitrary or capricious to consider the relationship between the effects of two independent rules when the second rule is adopted, instead of considering the effects of a yet-to-be adopted rule in the first rulemaking.

Petitioners likewise assert (Br. 39-41) that the Commission erred in failing to consider the impact of "two interrelated rules" when it "refused to consider anything about the Short Sale Rule in [the Securities Lending Rule's] economic analysis."  But the rules are not interrelated.  Because neither rule depends on the

other to function, they could have been considered by the Commission months or years apart, or one could have been adopted without the other.

Understanding that distinction distinguishes this case from *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (per curiam), on which *Amicus* Chamber of Commerce relies (Br. 15).  Unlike here, a definition in the second finalized rule in *Portland Cement* directly limited the scope and applicability of the first.  *Id.* at 188.  Moreover, while the EPA in that case scheduled its rulemaking to *avoid* considering the impact of either of the rules on each other, *id.* at 187-88, the Commission here specifically considered the interplay of both rules, even explaining that during the brief period when the Short Sale Rule is operative (but the Securities Lending Rule is not fully implemented), the "benefits and costs of many of the [Short Sale Rule's economic] effects" could be "temporarily magnif[ied]."  Short Sale R. 75,162 n.615.

Petitioners' approach, moreover, lacks any limiting principle.  In petitioners' view, any final rule must analyze the economic impacts of every proposed rule that is somehow related to the rule being adopted.  Indeed, petitioners and *amici* provided comments to the Commission asserting that it needed to consider the cumulative, combined economic impact of *six other* proposed rules on at least one of the rules at issue here.  Sec. Lend. R. 75,694 n.725; Short Sale R. 75,149 nn. 498-99.  Petitioners offer no explanation for how the Commission could, as a

practical matter, assess the likely economic consequences of multiple pending proposals that it might never adopt or might adopt with alterations as a necessary (and beneficial) consequence of the notice-and-comment process—let alone why such analysis would be required under the APA.

In sum, including the Securities Lending Rule in the baseline consideration of the Short Sale Rule falls squarely within the "considerable discretion" that this Court affords agencies in "conducting 'the complex ... economic analysis typical in the regulation promulgation process.'" *Huawei Tech's*, 2 F.4th at 452 (citation omitted). The Court should thus "decline[] to re-weigh the technically complex trade-offs the Commission carefully considered." *Nasdaq*, 34 F.4th at 1114.

## 2. The Commission's approach is consistent with prior practice.

The Commission's inclusion of only adopted rules in the baseline of each rule's economic analysis is consistent with past practice and the Commission's overall approach to economic analysis. *See supra* pp. 32-36. In suggesting that the Commission took a different approach in past rulemakings, petitioners largely point (Br. 41-43) to instances, such as *Investment Company Reporting Modernization*, 81 Fed. Reg. 81,870, 81,923 (Nov. 18, 2016), in which the Commission concurrently adopted rules that specified reports, forms, and requirements *necessary to implement* the others. Here the Commission adopted

new Form SHO when it issued the Short Sale Rule, Short Sale R. 75,100, and

imposed new collection and dissemination rules on FINRA in the Securities

Lending Rule, Sec. Lend. R. 75,644.  Because Form SHO and the collection and

dissemination rules for FINRA were necessary to implement the Short Sale and

Securities Lending rules respectively, their economic effects were likewise

analyzed as part of those rules.  *Amici* Former SEC Chief Economists likewise cite

(Br. 15-16) the Commission's consideration of comments "to other proposed

Commission rulemakings" in a rulemaking regarding security-based swap data

repositories, where the "other" rulemakings were adopted "to implement" new

reporting requirements.  80 Fed. Reg. 14,438, 14,440-01 (Mar. 19, 2015).[5]

     None of these examples stand for the proposition that the Commission was

required to perform, across multiple releases, "a full cumulative economic analysis

of the two rules' costs and benefits in combination."  Br. 41 n.3.  That is especially

so because, while the rules here were adopted sequentially on the same day, they

were not adopted "concurrently" as part of an interrelated package.  Neither the

Securities Lending Rule nor the Short Sale Rule is a mechanism for implementing

the other; they function independently, and they were voted on separately.

---

[5] These *amici* also refer (Br. 6-8) to the *Pay Versus Performance Rule*, but there, only one rule was under consideration throughout a multi-year process. *See* 87 Fed. Reg. 55,134, 55,135 (Sept. 8, 2022).

41

Petitioners point out that, in adopting *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33,318, 33,327 (July 12, 2019), the Commission "concurrently" adopted *Form CRS*, 84 Fed. Reg. 33,492, 33,593 (July 12, 2019), but petitioners again overstate the degree to which the rules analyzed each other's the economic impact.  Nothing in those rulemakings demonstrates that the Commission took a different approach to its economic analyses than its usual approach of analyzing the incremental effect of each rule over the baseline, which includes recently adopted (but not recently proposed) rules.  That the first adopted rulemaking had references to the subsequently adopted one merely reflects that, unlike the rules at issue here, Regulation Best Interest and Form CRS were considered as an interrelated "package of rulemakings," 84 Fed. Reg. at 33,345, adopted on the same day because, among other things, completing Form CRS was one way of satisfying certain Regulation Best Interest requirements and the two rules drew from the same statutory authority.  This example thus does not evince a departure from the Commission's approach to independent yet related rules; nor does it demonstrate that accounting for already-adopted rules in an economic baseline, as the Commission did here, is unreasonable.

## II. The Commission's adoption of each rule complied with the APA.

Petitioners fare no better in challenging the rules individually, as the Commission "reasonably considered the relevant issues and reasonably explained [its] decision[s]." *Prometheus Radio Project*, 141 S. Ct. at 1158.

### A. The Commission's adoption of the Securities Lending Rule is authorized by the Exchange Act and satisfies the APA.

The Securities Lending Rule reflects a reasoned approach to rulemaking that is consistent with both the Exchange Act and the APA. Contrary to petitioners' assertion, the rule fulfills Congress's express mandate to increase the available information in the securities lending market, and it is not undermined by a separate statutory provision that governs only short sales. Petitioners also err in claiming that they lacked a meaningful opportunity to comment on the 20-business-day delay of disclosing loan amount information, because the Commission asked commenters for feedback on the timing of disclosures and implemented the delay in response to commenter concerns regarding disclosing such data too quickly.

#### 1. The Commission reasonably fulfilled its statutory mandate to increase transparency in the securities lending market.

Exchange Act section 10(c) makes it unlawful for any person, directly or indirectly, to engage in "a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe."

15 U.S.C. 78j(c)(1).  Dodd-Frank section 984(b), in turn, mandates that "the Commission shall promulgate rules that are designed to increase the transparency of information available to brokers, dealers, and investors, with respect to the loan or borrowing of securities." 124 Stat. 1933.

Pursuant to this "unambiguously expressed intent of Congress," *Board of Governors, FRS v. Dimension Fin. Corp.*, 474 U.S. 361, 368 (1986), the Securities Lending Rule increases the availability of information by requiring certain parties to securities loans to report to FINRA the material terms of each covered securities loan transaction.  17 C.F.R. 240.10c-1a(a), (c).  FINRA then must make most of the collected information publicly available.  17 C.F.R. 240.10c-1a(g).  And except for loan size data, FINRA is required to publish that information "not later than the morning of the business day after the covered securities loan is effected." 17 C.F.R. 240.10c-1a(g)(1), (3).  These measures fulfill Dodd-Frank's mandate to increase information in the securities lending market and further the statute's goal of "improving accountability and transparency in the financial system." *Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 155 (2018).

Petitioners argue (Br. 46-50) that the data required by the Securities Lending Rule conflicts with Dodd-Frank *section 929X*, 15 U.S.C. 78m(f)(2), which concerns short sales, because there Congress asked the Commission to prescribe rules for the disclosure of, *inter alia*, "the aggregate amount of the number of short

sales of each security" at least monthly.  In their view, section 929X also dictates

monthly, aggregate disclosure of *securities lending data*—even though section

929X never mentions securities lending information, and section 984, which does

govern disclosure of securities lending information, contains no such limitation.

Petitioners have it backwards.  The Commission adopted the Securities

Lending Rule pursuant to Dodd-Frank section 984, which specifically authorizes

the Commission to increase transparency "with respect to the loan or borrowing of

securities" and does not contain limits on the timing of the relevant disclosures.

124 Stat. 1933.  There is no justification for importing limitations from section

929X that Congress, in the same piece of legislation, did not see fit to include in

section 984.  "[W]here Congress includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion."

*Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991).

Petitioners also misunderstand the text of section 929X, which sets a floor

(not a ceiling) with respect to the Commission's publication of data related to short

sales.  Section 929X directs the Commission to "prescribe rules providing for the

public disclosure of the name of the issuer and the title, class, CUSIP number,

aggregate amount of the number of short sales of each security, *and any additional

information determined by the Commission* following the end of the reporting

period. *At a minimum*, such public disclosure shall occur every month." 15 U.S.C. 78m(f)(2) (emphases added). The italicized text, omitted by petitioners, broadly authorizes the Commission to publish "any additional information" regarding short sales as often as it sees fit—but no less frequently than monthly. *See*, *e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning[.]"). So even if section 929X were relevant to the Securities Lending Rule, it would not conflict with the disclosure requirements the Commission adopted.

Finally, relying solely on a staff report, petitioners incorrectly assert (Br. 49-50) that the Securities Lending Rule conflicts with the Commission's "own past determinations" with respect to disclosing information relating to short selling. The staff report states that "[t]he Commission has expressed no view regarding the analysis, findings, or conclusions contained herein." *See Short Sale Position and Transaction Reporting*, SEC Div. of Econ. & Risk Analysis, Cover Page (June 5, 2014). Moreover, the staff report states that "the details of securities lending programs"—*i.e.*, details that may be disclosed under the Securities Lending Rule— "are beyond the scope of this study." *Id.* at 5. And the report's analysis of short sellers disclosing their short positions in real-time in a manner that would also reveal their identity, *id.* at 72, 80, 83, is a far cry from the Securities Lending Rule's requirement that a registered national securities association such as FINRA

anonymously disclose certain securities loan terms on the next business day and loan amounts 20 business days later, especially considering the other potential purposes of such securities loans.

### 2. The final Securities Lending Rule is a logical outgrowth of the proposed rule.

The comment period for the proposed Securities Lending Rule gave the public a meaningful opportunity to participate in the rulemaking process. The Commission received nearly 2,000 comments on the proposal. Certified List, 2-100. The Commission made numerous revisions to the proposed rule in response, Sec. Lend. R. 75,649, including changing the proposed 15-minute intraday reporting timeline to an end-of-day reporting requirement, as well as delaying the dissemination of loan size data from the next business day to 20 business days after a loan is effected or modified, 17 C.F.R. 240.10c-1a(g). Petitioners nonetheless erroneously contend (Br. 50-53) that they were denied a meaningful opportunity to comment on the 20-business-day delay because it was not a logical outgrowth of the proposed rule.

That the Securities Lending Rule is "a logical outgrowth of the rule proposed," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up), is best demonstrated by the fact that, after requesting comments on the proposal, the Commission adopted "changes … in the final rule [that] were

instigated by industry comments," *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989).  Under the proposal, FINRA would collect various securities lending data, including "[t]he amount of the security loaned," and publish that information "as soon as practicable."  Sec. Lend. Prop. 69,852.  The Commission "ask[ed] commenters" whether it should "specify how quickly [FINRA] should make the information publicly available? If so, ... how long should [FINRA] be given?"  *Id.* at 69,813.  The Commission similarly—but separately—asked "whether [loan] information should be published in a shorter or longer time frame" than "as soon as practicable."  *Id.* at 69,821.  And in a section titled "Alternative Timeframes for Reporting or Dissemination," the proposal stated that the Commission "could consider alternative delays for ... disseminating the securities lending transaction information," *id.* at 69,846, and linked dissemination timelines to loan amounts, *id.* at 69,847.

Many commenters expressed concern that publicizing transaction-level securities loan data on the proposed 15-minute timeline would reveal short sale trading strategies.  *See, e.g.*, Sec. Lend. R. 75,655.  Petitioner AIMA, among others, suggested an alternative timeline for disseminating loan data.  AIMA, A.R.127, at 4-5 & n.12 (Jan. 7, 2022) (aggregate Wholesale lending data should be published on a T+1 basis and aggregate Customer lending data should be published "on a weekly basis"); Investment Company Institute, A.R.110, at 11 (Jan. 7, 2022)

48

(loan-level data should not be made public on intra-day basis).  The Commission

responded to these concerns by adopting end-of-day reporting, delaying the release

of loan size information by 20 business days, and explaining how that delay

significantly reduces the risk that disclosure will have negative consequences,

*supra* pp. 25-30.  An agency's adoption of changes that respond to comments

"underlines that the rule logically emerged from the rulemaking."  *Huawei*, 2 F.4th

at 449.

**B.  The Commission's selection of reporting requirements in the Short Sale Rule satisfies the APA, and the rule applies only to short sale transactions in equity securities effected in the United States.**

The Commission likewise complied with the APA in adopting the Short Sale

Rule.  In contending that the Commission did not adequately explain its selection

of EDGAR reporting over the alternative of reporting to FINRA, petitioners ignore

the Commission's explanation that EDGAR reporting would better increase

transparency into short positions consistent with section 929X's mandate.  *See*

Short Sale R. 75,130.  And petitioners misread the rule in arguing that it has an

impermissible extraterritorial reach, because the rule applies only to Managers that

effect U.S. short sale transactions in equity securities subject to Regulation SHO, and Regulation SHO applies only to domestic transactions.

> **1. The Commission reasonably explained why it required Managers to report short sale information to the Commission via EDGAR.**

The Short Sale Rule requires that Managers report short position data by filing a Form SHO in the EDGAR system.  17 C.F.R. 240.13f-2(a)(3).  Most Managers are familiar with filing documents in the EDGAR system, which the Commission created 30 years ago to facilitate the electronic submission of, and public access to, mandatory filings under the federal securities laws.  Short Sale R. 75,655 & nn.181-82; Electronic Filing and the EDGAR System: A Regulatory Overview, *available at* https://www.sec.gov/info/edgar/regoverview.htm (last visited May 6, 2024).  The new Form SHO can be filed in a manner that is consistent with EDGAR filings that Managers already must make.  Short Sale R. 75,177, 75,118.

Petitioners incorrectly claim (Br. 54-57) that the Commission did not consider alternative reporting through "enhancing the existing FINRA program." Agencies have discretion to choose between alternative methods of achieving objectives so long as they set forth a "'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs.*, 463 U.S. at 43 (citation omitted). That is the case here, where the Commission "cogently explain[ed] why it ...

exercised its discretion" and adopted EDGAR reporting over the proffered alternative.  *Id.* at 48.

As the Commission explained, it rejected the FINRA alternative because "FINRA's short interest reporting is applicable only to *broker-dealers* that are FINRA member firms."  Short Sale R. 75,105 (emphasis added).  The Short Sale Rule, by comparison, applies to "Managers represent[ing] a more diverse group of market participants," including "investment advisers, banks, insurance companies, pension funds, and corporations."  *Id.*; *id.* at 75,148 n.493.  FINRA reporting also "would have provided less transparency into the short sale market," because it would not provide "the positions of any identified Managers or any Manager-specific activity data," nor would it "distinguish[] Managers with large positions from other Managers."  *Id.* at 75,176.  The Short Sale Rule requires such information to be provided to the Commission through EDGAR.  *Id.* at 75,129.  Moreover, the Short Sale Rule "require[s] the reporting of only substantial, hence more informative, short positions," *id.* at 75,130, "set[ting] Rule 13f-2 apart" from FINRA, which "do[es] not have thresholds," *id.* at 75,112.  And EDGAR will expand the information available to market participants, because it "provide[s]

aggregated short sale-related data in a readily accessible location[,] free and

accessible to all investors and other market participants." *Id.* at 75,131.[6]

Petitioners assert (Br. 57-58) that EDGAR reporting improperly creates an

"enhanced cybersecurity risk" compared to FINRA reporting, but the

Commission's contrary finding was amply supported by the record. The

Commission explained that "the likelihood of a data breach is low," because it

"recently deployed security and modernization enhancements focusing on

technology upgrades to the EDGAR system." Short Sale R. at 75,172 (discussing

Annual Report on SEC website Modernization Pursuant to Section 3(d) of the 21st

Century Integrated Digital Experience Act (Dec. 2022)).[7] In addition, the

Commission reasoned, the risk of a security breach is likewise reduced and any

effects of a breach mitigated by the "adherence" of market participants (like the

exchanges and FINRA) "to … existing requirements designed to improve the

resiliency and oversight of securities market technology infrastructure, such as

Regulation Systems Compliance and Integrity (17 C.F.R. 242.1000 through

---

[6] The Commission's approach here is also consistent with existing regulations. For example, transaction reporting in equities and fixed income securities is generally administered by self-regulatory organizations (*e.g.*, FINRA, exchanges, and national market system plans), whereas position reporting is generally managed directly by the Commission via EDGAR (*e.g.*, Form 13F, Schedule 13D, and Schedule 13G).

[7] *Available at* https://www.sec.gov/files/21st-century-idea-act-report-2022-12.pdf.

242.1007).” Short Sale R. at 75,172. The Commission therefore took account of petitioners’ asserted cybersecurity concerns and reasonably explained its choice of EDGAR reporting over FINRA reporting.

### 2. The Short Sale Rule does not apply to transactions in foreign securities effected outside the United States.

Contrary to petitioners’ contention (Br. 58-64), the Short Sale Rule does not apply to short sale transactions of foreign equity securities effected outside the United States, which are not subject to the requirements of Regulation SHO. As the Commission explained, the rule would require “Managers ... to report to the Commission certain short sale related data ... for equity securities consistent with the Commission’s [existing] short sale regulations (i.e., Regulation SHO).” Short Sale Prop. 14,965-66. Rules 200, 203 and 204 of Regulation SHO (17 CFR 242.200; 242.203; 242.204) impose various substantive requirements on broker-dealers when they “effect short sales of securities traded in the United States[.]” *Short Sales*, 69 Fed. Reg. 48,008, 48,014 n.54 (Aug. 6, 2004); *see also* Short Sale R. 75,101. The Short Sale Rule’s data reporting obligation applies, in turn, to Managers engaged in short sale transactions of equity securities “that are already subject to Regulation SHO,” and thus effected in the United States, Short Sale R. 75,100, 75,109, and “the aggregated short sale-related data that will be published by the Commission under Rule 13f-2 will provide additional context to market

participants regarding equity securities that are subject to the requirements of

Regulation SHO." *Id.* at 75,107.

Just as Regulation SHO does not apply to securities transactions effected

outside the United States, neither does the Short Sale Rule.[8]  Indeed, at no point did

the Commission state that the Short Sale Rule would apply to short sale

transactions effected outside the United States.  And the fact that the Short Sale

Rule does not apply to transactions effected outside the United States explains

why, as petitioners point out (Br. 64), "the Commission made no effort to assess

the costs of reporting foreign short sales, or the potential conflicts[.]"

In mistakenly contending (Br. 60-62) that the Short Sale Rule "impose[s] a

global short-sale reporting regime," petitioners focus on a single paragraph in the

adopting release that discusses when a Manager is subject to the rule's short-sale

data reporting obligations.  That paragraph simply explains that the domestic

trigger to bring an entity within the rule's reporting requirements (which, again,

apply to short positions in equity securities effected in the United States) is "being

an institutional investment manager operating in the U.S. securities markets such

---

[8] Petitioners assert (Br. 62) that Section 13(f)(2) is focused on only domestic short sales.  But this Court need not address Section 13(f)(2)'s statutory reach because the Commission's rule applies only to domestic short-sale transactions.

that the investment manager is subject to filing reports with the Commission."
Short Sale R. 75,109.

***

The Securities Lending Rule and the Short Sale Rule are both well-reasoned exercises of the Commission's discretion that were adopted consistent with applicable law and at the direction of Congress.  The rules should be upheld.

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

DOMINICK V. FREDA
*Assistant General Counsel*

EMILY T. PARISE
*Senior Appellate Counsel*

*/s/ Stephen A. Silverman*
STEPHEN A. SILVERMAN
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Silverman)
silvermanst@sec.gov

May 6, 2024

## CERTIFICATE OF SERVICE AND FILING

I certify that on May 6, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit through the Court's CM/ECF system.  Service on counsel of record will be accomplished through the Court's CM/ECF system.

I further certify that this electronic filing is an exact copy of the paper document, that any privacy redactions have been made, and that this electronic filing was scanned for, and found to be free of, viruses.

*/s/ Stephen A. Silverman*
Stephen A. Silverman

Dated: May 6, 2024

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,087 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, Times New Roman, 14-point typeface.

/s/ Stephen A. Silverman
Stephen A. Silverman

Dated: May 6, 2024